Louis **SIMON, et al., Appellants**
(Plaintiffs below),

v.

**UNITED STATES, Appellee**
(Defendant below).

**John Fare, Appellant (Cross–**
**Plaintiff below),**

v.

**United States, Appellee (Cross–**
**Defendant below).**

No. 94S00–0308–CQ–377.

Supreme Court of Indiana.

March 30, 2004.

Karl Mulvaney, Nana Quay–Smith, Indianapolis, IN, Joel S. Perwin, Michael S. Olin, Miami, FL, Arthur Raynes, Stephen Raynes, Philadelphia, PA, Joseph Lamonaca, Chadds Ford, PA, Attorneys for Appellants.

Peter D. Kiesler, Assistant Attorney General, Jeffrey S. Bucholtz, Deputy Assistant Attorney General, Susan W. Brooks, United States Attorney, Thomas E. Kieper, Assistant United States Attorney, Terence M. Healy, Rodney Patton, United States Department of Justice, Washington, District of Columbia, Attorneys for Appellee.

SHEPARD, Chief Justice.

The U.S. Court of Appeals for the Third Circuit has certified two questions regarding Indiana's choice-of-law rules. We hold that there is a true conflict between the choice of law rules of Indiana and the District of Columbia because Indiana does not engage in *dépeçage* and has not adopted the policy analysis component of the Restatement (Second) of Conflict of Laws approach. In so saying, we restate the Indiana choice of law analysis outlined in *Hubbard Manufacturing Co. v. Greeson*, 515 N.E.2d 1071 (Ind.1987).

## Statement of Facts

This case involves a wrongful death suit brought against the United States by the estates of individuals killed in the crash of a small private aircraft. The flight began in Pennsylvania, included an overnight stop in Ohio, and ended in Kentucky while attempting to land at the Somerset Airport. The plane never flew through Indiana airspace. Two of the passengers lived in Pennsylvania and one lived in Georgia; the pilot lived in New Jersey but worked in Pennsylvania. The plane was owned by a Delaware-based, wholly-owned subsidiary of a company incorporated in Pennsylvania, where the plane was hangared.

Relying on a chart published by the Federal Aviation Administration in Washington, D.C., the pilot sought clearance to complete a Simplified Directional Facility (SDF) approach due to the poor weather conditions. FAA air traffic controllers based at Indianapolis cleared the approach

despite the fact that the instrumentation required for the landing at Somerset Airport had not been operational for several years. While attempting to land, the plane struck a radio tower and crashed.

Plaintiffs filed four wrongful death complaints in the U.S. District Court for the Eastern District of Pennsylvania against the United States under the Federal Tort Claims Act (FTCA). They alleged (1) negligence in the publication at Washington of a chart incorrectly showing that a long-inactive instrument landing approach at the airport was active; and (2) the negligence of Indiana-based air traffic controllers in clearing the pilot for an approach that was out of service, neglecting to monitor the radar during the flight's landing approach, failing to alert the pilot that he was in peril of striking an obstacle, and failing to respond to the pilot's last-minute radio communications. (App. at 52–57).

Of these cases, two have settled. The remaining two, which were brought on behalf of the pilot and one of the passengers from Pennsylvania, are the subject of an interlocutory appeal to the Third Circuit. To facilitate its resolution of that appeal, the Third Circuit certified the following questions to us:

1.) Whether a true conflict of law exists between Indiana's and the District of Columbia's choice-of-law rules; and

2.) If a true conflict exists and Indiana's choice-of-law rules therefore control per the "last significant act" test, how should a split among the choice-of-law factors identified in *Hubbard Manufacturing Co., Inc. v. Greeson,* 515 N.E.2d 1071 (Ind.1987), be resolved in choosing a jurisdiction's substantive law when one factor points toward Indiana, another toward Pennsylvania, and the third is indeterminate, and which jurisdiction's

substantive law would Indiana apply under the facts of this case?

*Simon v. United States,* 794 N.E.2d 1087 (Ind.2003). We accepted the certification pursuant to Appellate Rule 64.

## I. Does a true conflict exist between the choice-of-law rules of Indiana and the District of Columbia?

Under the FTCA, a court should apply the whole law, including choice-of-law rules, of the place where the acts of negligence occurred. 28 U.S.C. §§ 1346(b), 2674; *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). In this case, acts of negligence occurred in both Indiana and D.C. The Third Circuit held that if there is a true conflict between the choice-of-law rules of the two jurisdictions, it will apply the law of the place where the last significant act or omission occurred, in this case Indiana. *Simon v. United States,* 341 F.3d 193, 203–04 (3rd Cir.2003). The first certified question asks whether such a conflict exists. The Third Circuit identified two areas of potential conflict: (1) the use of *dépeçage* and (2) the role of policy. We conclude that a true conflict exists between the rules of the two jurisdictions.

### A. Dépeçage

■ *Dépeçage* is the process of analyzing different issues within the same case separately under the laws of different states. Although Indiana allows different claims to be analyzed separately, it does not allow issues within those counts to be analyzed separately. For example, an Indiana court might analyze a contract claim and a tort claim independently but would not separately analyze and apply the law of different jurisdictions to issues within each claim. *Dépeçage* has not been part

of Indiana's lexicon.[1]

Under our history as a *lex loci delecti* state, Indiana courts applied the law of the state in which the tort was committed. *Hubbard Manufacturing Co. v. Greeson*, 515 N.E.2d 1071, 1073 (Ind.1987). Courts did not consider whether the law of a different state might be more relevant to the claim, much less to individual issues within the claim. Plaintiffs argue that our liberalization of the *lex loci* rule in *Hubbard* implicitly adopted *dépeçage*. (Appellants Br. 24–25.) They say that because the opinion employs language similar to that used in the Restatement (Second) of Conflict of Laws and cites the Restatement for factors courts might consider when the place of the tort is insignificant, *Hubbard* must have also adopted the Restatement's use of *dépeçage*. *Id.*

This argument is unpersuasive. First, our opinion in *Hubbard* made it clear that the Second Restatement factors listed in *Hubbard* were mere examples of factors that courts might consider. We cited the Restatement as the source of the listed contacts, but the list was not an exclusive one. We did not adopt the Restatement's approach to resolving conflicts. Second, the *Hubbard* language relied on by plaintiffs, though similar to the language used in the Restatement, does not amount to an adoption of *dépeçage*, a matter not even contemplated in the resolution of that appeal. The language at issue is the Court's instruction that "[t]hese factors should be evaluated according to their relative im-

portance to the particular issues being litigated." *Hubbard*, 515 N.E.2d at 1074. Read alone or in the context of the opinion, the statement recognizes that the relevance of the various factors will vary from case to case due to the particular issues being litigated and instructs courts to analyze the factors according to their relative importance. It does not suggest that a court apply different law to individual issues. Any ambiguity is easily eliminated by the Court's application of the test to the facts of *Hubbard:* the Court applied the factors to the wrongful death action and found that Indiana law applied; it did not make separate determinations for individual issues within the action.[2]

Moreover, because Indiana is still primarily a *lex loci* state and *lex loci* analysis does not allow for the application of *dépeçage*, most cases necessarily would not deploy *dépeçage*. It would be illogical, therefore, to incorporate it into the second step of the *Hubbard* analysis.

On the simple merits of *dépeçage* as a judicial technique, we find ourselves unimpressed. By making separate determinations for each issue within a claim, the process amalgamates the laws of different states, producing a hybrid that may not exist in any state. This is a problem for several reasons. First, legislatures "may enact a given law only because of its expected interaction with a complementary law." Erin A. O'Hara & Larry E. Ribstein, *From Politics To Efficiency In Choice–Of–Law*, 67 U. Chi. L.Rev. 1151,

---

1. In fact, we could find only one case decided in Indiana that even mentions the word, and it was decided by a federal district court applying Arizona conflict of law rules under the Federal Tort Claims Act. *See Estate of Sullivan v. United States*, 777 F.Supp. 695, 698 (N.D.Ind.1991).

2. Cases decided since *Hubbard* have also followed this approach. *See Allen v. Great*

*American Reserve Ins. Co.*, 766 N.E.2d 1157 (Ind.2002) (making choice-of-law determinations for different counts and different defendants, but not for different issues); *Jean v. Dugan*, 20 F.3d 255 (7th Cir.1994) (evaluating factors according to their relative importance to the issues before the court then making a determination for the tort as a whole).

1193 (2000). For example, a legislature may allow recovery for certain injuries or impose a low standard of proof for liability but place a cap on the damages that might be recovered or adopt immunities for certain potential defendants. *Id.* Consequently, applying the law outside the context of the other laws in the jurisdiction may contravene legislative intent. In addition, applying a law in isolation increases the likelihood that its purpose and importance will be misconstrued, thereby thwarting state policy. William H. Allen & Erin A. O'Hara, *Second Generation Law And Economics Of Conflict Of Laws: Baxter's Comparative Impairment And Beyond,* 51 Stan. L.Rev. 1011, 1033 (1999). Ultimately, by applying *dépeçage* a court may hinder the policy of one or more states without furthering the considered policy of any state.

*Dépeçage* may also produce unfair results because the hybrid law may be more favorable to one party than another, allowing a result that could not be reached if the laws of any one state were applied. As Brainerd Currie said, a party "should not be allowed to put 'together half a donkey and half a camel, and then ride to victory on the synthetic hybrid.' " Christopher G. Stevenson, *Depecage: Embracing Complexity to Solve Choice–of–Law Issues,* Note, 37 Ind. L.Rev. 303, 320 (2003) (quoting Frederick K. Juenger, *How Do You Rate a Century?.* 37 Williamette L.Rev. 89, 106 (2001) (quoting Brainerd Currie)). Moreover, *dépeçage* compounds the advantage of parties with greater access to legal resources because it requires a separate analysis of each issue for each state involved.

■ Because D.C.'s choice-of-law rules permit *dépeçage*[3] and Indiana's do not, there is a true conflict between the choice-of-law rules used by D.C. and Indiana.

### B. Role of Policy

■ Although Indiana and the District of Colombia consider the same basic contacts when analyzing a conflict-of-law problem, we approach the problem from different perspectives. "D.C. implements a hybrid of the 'governmental interest' and Restatement (Second) methodologies that identifies the governmental policies underlying the applicable laws and determines which state's policy would be most advanced by having its laws applied to the facts of the case." *Simon,* 341 F.3d at 200 (citing *Raflo v. United States,* 157 F.Supp.2d 1, 4 (D.D.C.2001)). Indiana does not require that courts undertake the difficult and ultimately speculative task of identifying the policies underlying the laws of multiple states and weighing the potential advancement of each in the context of the case.[4] Indiana courts, assuming they reach the second step of the *Hubbard* analysis, simply look at the contacts that exist between the action and the relevant states and determine which state has the most significant relationship with the action.[5]

This difference in approach may or may not lead to the selection of different states in a given case. We need not determine whether the difference is a false conflict in this case, however, because the difference

---

3. "It is clear that D.C.'s choice-of-law rules permit depeçage." *Simon,* 341 F.3d at 201.

4. The Seventh Circuit calls this approach the "maddeningly indefinite 'interest-balancing' approach to conflicts issues." *Carter v. United States,* 333 F.3d 791, 794 (7th Cir.2003).

5. *See, e.g., Jean v. Dugan,* 20 F.3d 255, 261 (7th Cir.1994); *Cap Gemini America, Inc. v. Judd,* 597 N.E.2d 1272, 1282 (Ind.Ct.App. 1992).

between the jurisdictions' stances on *dépeçage* is sufficient to create a true conflict between the laws of Indiana and D.C.

## II. Indiana's Choice-of-law Rules

The second certified question asks us to determine whether the substantive law of Indiana or Pennsylvania would apply under Indiana conflicts law. Assuming that Indiana's choice-of-law rules apply, the court should apply Indiana substantive law.

As Judge Calabresi said so famously, we live in an age that is "choking on statutes." Guido Calabresi, *A Common Law for the Age of Statutes* 1 (1982). Rules about choice of law are among the few fields still dominated by judge-made doctrine. Some seventeen years ago, this Court concluded that Indiana's tradition of adherence to *lex loci* served well in many cases, but not in all. Saying that rigid application of *lex loci* could lead to absurd results, we set out to liberalize our approach. *Hubbard,* 515 N.E.2d at 1073. One way to do that, of course, would have been to adopt the Restatement (Second) of Conflict of Laws. It seemed an unattractive path then, as it does now. The Second Restatement has been an inviting target for critics who assert that it supplies little real guidance to courts (much less to actors). As Professor Shreve observed, "The *Second Restatement* has attracted many judges (if fewer commentators), but it has not prevented the subject of choice of law from reaching what many believe is a state of crisis." Gene R. Shreve, Introduction, *Symposium: Preparing for the Next Century—A New Restatement of Conflicts?*, 75 Ind. L.J. 399, 399 (2000). Another commentator noted:

> The second Restatement thus was a hodgepodge of all theories. A court was to compare apples, oranges, umbrellas, and pandas, and determine which state's law to apply by the relative importance assigned to these factors. The supposed virtue of the second Restatement was the freedom it provided courts to weigh all conceivably relevant factors and then tailor the choice of law to the circumstances of the case. That very flexibility was, however, equally its vice: courts could arrive at any outcome applying its factors, and no one could predict in advance what state's law governed their actions. The problem was not merely that courts were afforded the opportunity to be manipulative; the problem was that even a court without such desire could find in the second Restatement no guidance as to how it was to decide a case after identifying the factors in play.

Michael H. Gottesman, *Draining the Dismal Swamp: The Case for Federal Choice of Law Statutes,* 80 Geo. L.J. 1, 8 (1991) (footnote omitted).[6] Accordingly, we saw some value in using *lex loci* as a starting point and said that it would govern unless the state where the tort occurred "is an insignificant contact." *Hubbard,* 515 N.E.2d at 1073.

■ Thus, in tort cases Indiana choice-of-law analysis now involves multiple inqui-

---

6. See also, Douglas Laycock, *Equal Citizens of Equal and Territorial States: The Constitutional Foundations of Choice-of-Law,* 92 Colum. L.Rev. 249, 253 (1992) ("Trying to be all things to all people, it produced mush."); Friedrich K. Juenger, *A Third Conflicts Restatement?,* 75 Ind. L.J. 403, 405 (2000) ("Many courts seem to like the 'mishmash,' or 'kitchen-sink,' concoction the restaters produced; after all, it enables judges to decide conflicts cases any which way they wish. To be sure, the Second Restatement's unprincipled eclecticism has done little to strengthen the intellectual underpinnings of our discipline."); Symeon C. Symeonides, *The Judicial Acceptance of the Second Conflicts Restatement: A Mixed Blessing,* 56 Md. L.Rev. 1248, 1281 (1997) ("The Restatement (Second) was intended to be and was 'a transitional work.'").

ries. As a preliminary matter, the court must determine whether the differences between the laws of the states are "important enough to affect the outcome of the litigation." *Hubbard*, 515 N.E.2d at 1073. If such a conflict exists, the presumption is that the traditional *lex loci delicti* rule (the place of the wrong) will apply. *Id.* Under this rule, the court applies the substantive laws of the "the state where the last event necessary to make an actor liable for the alleged wrong takes place." *Id.*

This presumption is not conclusive, however. It may be overcome if the court is persuaded that "the place of the tort 'bears little connection' to this legal action." *Id.* at 1074.

If the location of the tort is insignificant to the action, the court should consider other contacts that may be more relevant, "such as: 1) the place where the conduct causing the injury occurred; 2) the residence or place of business of the parties; and 3) the place where the relationship is centered." *Id.* at 1073–74 (citing Restatement (Second) of Conflict of Laws § 145(2) (1971)). These factors are not an exclusive list nor are they necessarily relevant in every case. All contacts "should be evaluated according to their relative importance to the particular issues being litigated." *Id.* at 1074. This evaluation ought to focus on the essential elements of the whole cause of action, rather than on the issues one party or the other forecasts will be the most hotly contested given the anticipated proofs.

The parties argue that either Indiana or Pennsylvania substantive law should be applied in this case. First, we must determine whether there is a true conflict between the laws of the two states. Because Indiana does not employ *dépeçage*, we consider the wrongful death cause of action as a whole. The Third Circuit determined that this case is essentially about damages and identified three areas where the applicable Indiana law differed from Pennsylvania law: (1) "Pennsylvania allows joint-and-several liability and right of contribution, while Indiana does not;"[7] (2) unlike Pennsylvania, "Indiana does not permit recovery for *both* wrongful death and survival damages;"[8] and (3) "unlike Indiana, Pennsylvania damages include the decedent's conscious pain and suffering from the moment of injury to the time of death." *Simon*, 341 F.3d at 204–05. We associate ourselves with the conclusion our Third Circuit friends have reached that there are significant differences between the substantive laws the two states would apply to the trial of these cases.

Because there is a conflict between the laws of Indiana and Pennsylvania that is important enough to affect the outcome of the litigation, we must determine which law to apply. The presumption is that the law of the place of the tort applies because in a "large number of cases, the place of the tort will be significant and the place with the most contacts." *Hubbard*, 515 N.E.2d at 1073. Our next inquiry, therefore, is the location of the tort, or where the last event necessary to make the United States liable occurred. *Id.*[9] For the

**7.** Ind.Code Ann. § 34–51–2–12 (West 1999). To the extent that the long-standing principle of joint and several liability may have been rejected in Indiana, this is so only for claims governed by the Indiana Comparative Fault Act. *See Control Tech., Inc. v. Johnson*, 762 N.E.2d 104, 109 (Ind.2002).

**8.** *Cahoon v. Cummings*, 734 N.E.2d 535, 543 (Ind.2000) (not reversible error to allow the plaintiff to proceed with both survival and wrongful death actions because the jury was instructed that it could not award damages for both).

**9.** *See, e.g., Allen v. Great American Reserve Ins. Co.*, 766 N.E.2d 1157, 1164–65 (Ind.2002) ("if

United States to be held liable in this wrongful death action, the plaintiffs must prove that a wrongful act or omission caused the deaths of the decedents. Ind. Code Ann. § 34–23–1–1 (West 1999). In this case, the allegedly negligent acts of the United States, the publication of the inaccurate chart and negligence of the air traffic controllers, occurred prior to the plane crash. Therefore the last event necessary to make the United States liable was the injury, which occurred when the plane crashed in Kentucky and the decedents died.[10] Consequently, under *lex loci delicti*, Kentucky law would apply.

Next, we must examine whether the place of the tort "bears little connection" to the legal action. *Hubbard*, 515 N.E.2d at 1074. This is one of the rare cases in which the place of the tort is insignificant. The negligence at issue occurred in Indiana and the District of Columbia, and none of the victims or the parties are residents of Kentucky (except to the extent that the United States is a "resident" of every state). The plane flew over multiple states during the course of the flight, and the crash might have occurred anywhere. In addition, unlike in cases involving an automobile accident, the laws of the state where the crash occurred did ·not govern the conduct of the parties at the time of the accident. Consequently, we conclude that the place of the tort was an insignificant contact in this case.

Because we hold that the place of the tort is insignificant to this action, we reach the second step from *Hubbard* and must consider what other contacts exist and evaluate them according to their relative importance to the litigation at hand. *Id.* We apply the law of the state with the most significant relationship to the case. *Hubbard* suggests three factors that might be relevant: "1) the place [or places] where the conduct causing the injury occurred; 2) the residence or place of business of the parties; and 3) the place where the relationship is centered." *Id.* This is not a comprehensive list, of course, and other relevant factors may be considered, though we see no others that are particularly pertinent in this case. "These factors should not be applied mechanically; rather, they are to be 'evaluated according to their relative importance to the particular issues before the court.'" *Jean v. Dugan*, 20 F.3d 255, 261 (7th Cir.1994) (quoting *Hubbard*, 515 N.E.2d at 1074).

As with many difficult choice-of-law cases, in this instance the contacts are splintered: the injury occurred in a different state than the allegedly negligent conduct, which occurred in a different state than where the plaintiffs reside. The gravamen of this case is the allegedly negligent conduct.[11] Consequently, ·the most

the plaintiffs have a valid claim, the reliance and consequent damage incurred by the plaintiffs is the 'last event' necessary to establish the elements of misrepresentation of a material fact reasonably relied upon"); *Hubbard Mfg. Co. v. Greeson*, 515 N.E.2d 1071, 1074 (Ind.1987) (the last event necessary to make the defendant liable for wrongful death was the fatal accident); *Judge v. Pilot Oil Corp.*, 205 F.3d 335, 336–37 (7th Cir.2000) (the last event necessary to make the defendants liable occurred where victim was shot and killed); *Jean*, 20 F.3d at ·261 (in a defamation case where the conduct at issue is publication, the place of the alleged tort is the place of injury, which under most circumstances is the place of publication).

10. *See Consolidated Rail Corp. v. Allied Corp.*, 882 F.2d 254, 256 (7th Cir.1989) ("the injury is usually, but not always, the last act necessary to complete the tort").

11. *Cf. Jean*, 20 F.3d at 261 (In a defamation case, the court said "bearing in mind the *Hubbard* court's directive to evaluate the factors 'according to their relative importance to the particular issues being litigated,' we think it clear that 'the place where the conduct causing the injury occurred' is the most sig-

important relevant factor is where the conduct causing the injury occurred because an individual's actions and the recovery available to others as a result of those actions should be governed by the law of the state in which he acts.[12]

Here, the negligent conduct occurred in both Indiana and D.C. The conduct in Indiana was more proximate to the harm, and none of the parties are arguing that D.C. law should apply. The residence or place of business of a party, while important in cases involving family law or asset distribution, is not a particularly relevant contact in this case. People do not take the laws of their home state with them when they travel but are subject to the laws of the state in which they act. Moreover, it is the conduct of the FAA and the air traffic controllers that is at issue, not the conduct of the plaintiffs. Finally, in a case such as this where the contact between the allegedly negligent party and the injured party is fleeting, there is no real relationship and therefore no place where that relationship could be centered.

Consequently, we hold that Indiana has a more significant relationship with the case and, therefore, under Indiana choice-of-law rules, Indiana law would apply.

## Conclusion

In conclusion, a true conflict exists between the choice-of-law rules of Indiana and the District of Columbia, and assuming that Indiana choice-of-law rules apply, Indiana would apply Indiana substantive law.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.

---

nificant factor and that it favors our application of Indiana law." (citation omitted)).

**12.** This principle is nearly universal.

> Even under the modern methods there are certain issues for which courts continue to apply the law of the place where the tort occurred. The most notable of these issues are those concerning a party's conduct. If the state of conduct has a law regulating how the tortfeasor or victim is supposed to act in the particular situation, courts will apply that standard rather than the law of the parties' residence. In fact, this preference for the conduct-regulating law of the conduct state is virtually absolute, winning out even over the law of other interested states. Courts as a practical matter recognize a conduct-regulating exception' to the normal interest-based choice-of-law methods.

John T. Cross, *The Conduct–Regulating Exception In Modern United States Choice–Of–Law*, 36 Creighton L.Rev. 425, 425 (2003) (footnote omitted). This is also true in Indiana. As the Seventh Circuit said when applying Indiana law in *Judge v. Pilot Oil Corporation*:

> The facts of this wrongful death case demonstrate that the last act necessary to make the defendant liable, the shooting of David, took place in Indiana. Furthermore, *the parties' conduct in Indiana that resulted in David's death will be the key element to determine if the defendants should be held accountable for David's death. The conduct of Pops and David will be governed by Indiana law; if there is any justification for Pops shooting David, it will be determined under Indiana law.* With all this, Indiana, the place of injury, cannot be said to be insignificant. 205 F.3d 335, 337 (7th Cir. 2000) (emphasis added).