**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEYS FOR APPELLANT:

**CYNTHIA S. GILLARD**
**ANDREW M. HICKS**
Warrick & Boyn, LLP
Elkhart, Indiana

ATTORNEYS FOR APPELLEES:

**GREGORY P. RIPPLE**
Miller Johnson
Grand Rapids, Michigan

**MICHELLE L. QUIGLEY**
Miller Johnson
Kalamazoo, Michigan

# IN THE
# COURT OF APPEALS OF INDIANA

GARRY BALTHES, )
)
    Appellant, )
)
        vs. ) No. 20A03-1111-CC-517
)
CONCEPT INDUSTRIES, INC., )
COMPOSITE TECHNOLOGIES, LLC, )
and SHAWN ESHRAGH, )
)
    Appellees. )

APPEAL FROM THE ELKHART CIRCUIT COURT
The Honorable Terry C. Shewmaker, Judge
Cause No. 20C01-1009-CC-202

**July 17, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Garry Balthes appeals the trial court's order entering summary judgment in favor of Concept Industries, Inc. ("Concept"), Composite Technologies, LLC ("Composite"), and Shawn Eshragh (Concept and Composite together, "Companies," and Companies and Eshragh together, "Appellees") and against Balthes. Balthes raises two issues, which we consolidate and restate as whether the court erred in entering summary judgment in favor of Appellees. We affirm in part, reverse in part, and remand.

The relevant facts follow. Concept manufactures returnable packaging systems, vacuum formed plastics and non-woven fiber products for the automotive, office furniture and other industries. Composite performs research development services for Concept. Companies are located in Grand Rapids, Michigan. Eshragh was the president of Concept, David Ellis was the vice-president of Concept, and David Foote was the chief financial officer of Concept.

In March 2007, Balthes entered into a consulting relationship with Companies and subsequently in 2007 accepted an offer of employment from Companies. Balthes's employment with Companies required him to relocate his personal residence from Elkhart County, Indiana, to Kent County, Michigan. In September 2007, to assist in the relocation, Eshragh paid $34,500 to Balthes to be used as a down payment on a new house in Kent County. Companies paid an additional total amount of $17,752 in the form of mortgage payments on Balthes's behalf on his residence in Elkhart County.

Balthes resigned his employment effective March 31, 2010, and Appellees demanded repayment of the above amounts. Balthes and Appellees entered into a written settlement agreement dated in June 2010 (the "2010 Settlement Agreement") which

2

provided that the total amount loaned to Balthes by Appellees, with accrued interest, exceeded $57,000 and that Balthes would pay Concept a total gross amount of $50,000 in two installments. The 2010 Settlement Agreement provided that the first installment payment would be $40,000 payable within ten days of the closing of the sale of Balthes's residence in Michigan or by July 15, 2010, whichever date occurred first, and the second installment payment would be for $10,000 payable by December 31, 2010. The 2010 Settlement Agreement also included certain non-competition and non-solicitation provisions, a provision providing that Appellees would release and discharge Balthes for all claims related to the loaned amounts in consideration of the payments, and that the agreement would be governed by the laws of the State of Michigan.

On or about July 15, 2010, Eshragh received a letter from Balthes accompanied by a personal check for $5,000. In the letter, Balthes stated in part that he was hoping to repay the full balance via a bank loan and that it was not his intention to drag out the repayment.

On September 8, 2010, Appellees filed a complaint in the Elkhart County Circuit Court in which Concept alleged breach of contract against Balthes and Appellees alleged unjust enrichment against him. On October 28, 2010, Balthes, *pro se*, filed an answer in which he asserted affirmative defenses and requested a trial by jury. On February 21, 2011, Appellees filed a motion for leave to amend complaint to include an allegation that Balthes failed to make the second installment payment due on December 31, 2010 under the 2010 Settlement Agreement, and the court granted Appellees' motion and ordered the amended complaint to be deemed filed. On April 26, 2011, Appellees filed a motion for

default judgment, and on April 29, 2011, Balthes filed a response to the motion for default and an answer to the amended complaint.[1]

On May 6, 2011, while the motion for default was pending, Eshragh and Ellis met with Balthes to discuss the possibility of Balthes performing some consulting work for Concept in exchange for Appellees' dismissal of the pending lawsuit. Balthes visited Concept's facility on May 10, 2011, and there was some additional communication between Balthes and Eshragh, Ellis, and the parties' attorneys during the following days. On May 16, 2011, Appellees filed a notice of withdrawal of their motion for default judgment, and the court ordered that the motion for default be withdrawn and Balthes's answer to the amended complaint be filed.

On June 29, 2011, Appellees filed a motion for summary judgment as to each claim asserted in their amended complaint, designating evidence together with a brief in support of the motion.[2] Appellees argued that under Michigan law it is undisputed that Balthes breached the 2010 Settlement Agreement and that Balthes has been unjustly enriched by receiving a benefit from Appellees that he has retained. On July 27, 2011, Balthes, *pro se*, filed a memorandum of law in opposition to Appellees' motion for

---

[1] In his response to Appellees' motion for default, Balthes stated that prior to filing their amended complaint Appellees asked for his consent to the motion to file the amended complaint and informed him that even if he did not oppose the amendment, he would still have the opportunity to answer and defend the complaint, and that from discussion with Appellees' counsel and given that the only reason for amending the complaint was to change the amount of money Appellees sought, he was under the impression that he did not have to file another answer.

[2] In support of their motion, Appellees designated among other things the affidavits of Eshragh and Foote.

summary judgment and requested that summary judgment be granted in his favor.[3] Balthes argued that the parties reached a valid modification of the 2010 Settlement Agreement on May 6, 2011 which precluded summary judgment, that an oral agreement on May 6, 2011 was a valid and enforceable settlement agreement, and that the oral agreement was not barred by the statute of frauds. Balthes also argued that oral promises may be enforced under the doctrine of promissory estoppel and equitable estoppel, that part performance may render an oral agreement enforceable under the statute of frauds, and that "[a]ll of these factors are present in this case." Appellant's Appendix at 77. On August 26, 2011, Appellees filed a response and argued that, while the parties did engage in negotiations in an effort to come to a settlement agreement, the parties never reached a final agreement that would modify, alter, or discharge Balthes's duties under the 2010 Settlement Agreement, and that Balthes's summary judgment motion should be dismissed.[4]

Following a hearing, the court issued an order entering summary judgment in favor of Appellees and against Balthes. The court found that at the hearing the parties agreed that they had entered the 2010 Settlement Agreement and that Balthes had paid only $5,000, leaving a balance due of $45,000, and that, accordingly, it is undisputed that the parties entered into a valid contract which Balthes ultimately breached. The court

---

[3] In his memorandum, Balthes designated his affidavit, in addition to other pleadings and the evidence by Appellees.

[4] In their response to Balthes's motion for summary judgment, Appellees designated the pleadings in the case, the materials designated in their motion for summary judgment, the supplemental affidavit of Eshragh, the affidavits of Ellis and Gregory Ripple, counsel representing Appellees, and the exhibits attached to those affidavits.

5

stated that Balthes argued that on May 6, 2011, the parties orally modified the 2010 Settlement Agreement, and the court found in part:

> The designated evidence establishes that the parties did engage in negotiations in an attempt to come to a resolution regarding Balthes's breach of the [2010] Settlement Agreement; however, there was never an agreement subsequent to the original agreement that modified or discharged [Balthes's] original obligation. [Appellees] concede that they met with [] Balthes on May 6, 2011 to discuss the possibility of Balthes providing consulting services in exchange for dismissing the lawsuit. In the days following the parties' negotiations, several proposals for a revised settlement agreement were presented; however, all were rejected by one or both of the parties. On June 2, 2011, Balthes rejected the final proposed agreement. No further negations ensued.

Id. at 9 (citations to record omitted). The court further found:

> In the instant case, the designated evidence shows that the parties engaged in negotiations in an effort to come to a subsequent settlement agreement; however, the evidence also establishes that they never reached a final agreement as to the essential terms of that proposed agreement. Therefore, no subsequent contractual agreement to discharge or modify [Balthes's] obligations under the [2010] Settlement Agreement was ever reached. The facts and evidence regarding [Balthes's] breach of the Settlement Agreement is undisputed. Accordingly, summary judgment in favor of [Appellees] is appropriate upon the amount due under the [2010] Settlement Agreement.

Id. at 10. The court entered judgment in favor of Appellees and against Balthes in the amount of $45,000.

The issue is whether the trial court erred in entering summary judgment in favor of Appellees and against Balthes. Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(c); Mangold ex rel. Mangold v. Ind. Dep't of Natural Res., 756 N.E.2d 970, 973 (Ind. 2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. Mangold, 756 N.E.2d at 973. Our review of a

6

summary judgment motion is limited to those materials designated to the trial court. Id. We must carefully review a decision on summary judgment to ensure that a party was not improperly denied its day in court. Id. at 974. Any doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmoving party. Cowe v. Forum Grp., Inc., 575 N.E.2d 630, 633 (Ind. 1991).

A party moving for summary judgment bears the initial burden of showing no genuine issue of material fact and the appropriateness of judgment as a matter of law. Monroe Guar. Ins. Co. v. Magwerks Corp., 829 N.E.2d 968, 975 (Ind. 2005). If the movant fails to make this prima facie showing, then summary judgment is precluded regardless of whether the non-movant designates facts and evidence in response to the movant's motion. Id. In reviewing a trial court's ruling on a motion for summary judgment, we may affirm on any grounds supported by the Indiana Trial Rule 56 materials. Catt v. Bd. of Commr's of Knox Cnty., 779 N.E.2d 1, 3 (Ind. 2002).

The fact that the parties make cross motions for summary judgment does not alter our standard of review. Hartford Acc. & Indem. Co. v. Dana Corp., 690 N.E.2d 285, 291 (Ind. Ct. App. 1997), trans. denied. Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. Id. The entry of specific findings and conclusions does not alter the nature of a summary judgment which is a judgment entered when there are no genuine issues of material fact to be resolved. Rice v. Strunk, 670 N.E.2d 1280, 1283 (Ind. 1996). In the summary judgment context, we are not bound by the trial court's specific findings of fact

7

and conclusions of law.  Id.  They merely aid our review by providing us with a statement of reasons for the trial court's actions.  Id.

Before we address Balthes's arguments, we note that the parties disagree as to the substantive law which applies to this case.  Appellees argue that the parties contractually agreed that Michigan law would govern the interpretation of the 2010 Settlement Agreement and that Indiana choice of law doctrine favors contractual stipulations as to governing law.  Balthes argues that the application of Indiana law to the May 6, 2011 settlement of a case pending in Indiana is reasonable under the "most intimate contacts" rule.  Appellant's Reply Brief at 7.  In support of his argument, Balthes points to the facts that the lawsuit is in Indiana, that he was a resident of Indiana, and that some of the services he would provide would be completed at his home in Indiana.

Choosing the appropriate state substantive law is a decision to be made by the court of the state in which the action is pending.  Kentucky Nat. Ins. Co. v. Empire Fire and Marine Ins. Co., 919 N.E.2d 565, 575 (Ind. Ct. App. 2010) (citing Travelers Ins. Co. v. Rogers, 579 N.E.2d 1328, 1330 (Ind. Ct. App. 1991)).  Accordingly, Indiana's choice of law rules apply to this case.  Indiana choice of law provisions generally favor contractual stipulations as to governing law.  Id. (citing Allen v. Great Am. Reserve Ins. Co., 766 N.E.2d 1157, 1162 (Ind. 2002)).

Indiana's choice of law rule for contract actions is the "most intimate contacts" test.  Id. (citing Schaffert by Schaffert v. Jackson Nat'l Life Ins. Co., 687 N.E.2d 230, 232 (Ind. Ct. App. 1997) (citations omitted), trans. denied).  The court will consider all acts of the parties touching the transaction in relation to the several states involved and

will apply as the law governing the transaction the law of that state with which the facts are in most intimate contact. Id. (citing Hartford Acc. & Indem. Co. v. Dana Corp., 690 N.E.2d 285, 291 (Ind. Ct. App. 1997) (citing W.H. Barber Co. v. Hughes, 223 Ind. 570, 63 N.E.2d 417, 423 (1945)), trans. denied). The following are representative of the factors to consider: (1) the place of contracting, (2) the place of negotiation, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. Id. (citing Emp'rs Ins. of Wausau v. Recticel Foam Corp., 716 N.E.2d 1015, 1024 (Ind. Ct. App. 1999) (citing Eby v. York-Div., Borg-Warner, 455 N.E.2d 623, 626 (Ind. Ct. App. 1983) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971))), reh'g denied, trans. denied). The location of the subject matter of the contract, also known as the principal location of the insured risk, is given greater weight than any other single contact in determining the state of the applicable law when that risk can be located principally in a single state. Id. It is also accorded greater significance when the other factors do not point primarily to one forum. Id.

However, a court need only undergo the analysis above if there is a difference between the relevant laws of the different states. Id. (citing Hartford Acc. & Indem. Co., 690 N.E.2d at 291 ("[B]efore entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states.") (citing Barron v. Ford Motor Co. of Canada Ltd., 965 F.2d 195, 197 (7th Cir. 1992), cert. denied, 506 U.S. 1001, 113 S. Ct. 605 (1992))). "If the purposes and policies of two potential rules are the same, the forum should apply the forum law."

9

Id.; see also Simon v. U.S., 805 N.E.2d 798, 805 (Ind. 2004) (noting that because there was a conflict between the laws of Indiana and Pennsylvania that was "important enough to affect the outcome of the litigation," the Court needed to determine which State's law to apply). In addition, the Indiana Supreme Court has held that Indiana does not engage in *dépeçage*, which is "the process of analyzing different issues within the same case separately under the laws of different states." Simon, 805 N.E.2d at 801. "Although Indiana allows different claims to be analyzed separately, it does not allow issues within those counts to be analyzed separately." Id. ("For example, an Indiana court might analyze a contract claim and a tort claim independently but would not separately analyze and apply the law of different jurisdictions to issues within each claim.").

Here, we observe that, to the extent Appellees initiated this lawsuit and alleged in their complaint and amended complaint that Balthes was in breach of the 2010 Settlement Agreement, the 2010 Settlement Agreement contained a provision providing that it would "be governed and construed in accordance with the domestic law of the State of Michigan without giving effect to any choice of law or conflict of law provision (whether of the State of Michigan or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Michigan." Appellant's Appendix at 30. Further, to the extent that Balthes argues that Indiana law may apply under the "most intimate contacts" rule to consideration of the agreement he asserts the parties reached at the May 6, 2011 meeting, we conclude that we need not undergo such an analysis because, as set forth below, there are no differences between the relevant laws of Michigan and Indiana as to the requirements of contract formation or promissory estoppel

10

that affect the outcome of the litigation in this case. See Dunn v. Meridian Mut. Ins. Co., 836 N.E.2d 249, 251 (Ind. 2005) (noting that the relevant laws of two states appeared to be the same and setting forth the relevant laws in both states).

We turn now to Balthes's arguments regarding the court's summary judgment ruling. Balthes contends that that he and Appellees reached an oral agreement on May 6, 2011 to settle the lawsuit and that, as a result, Appellees should be compelled to abide by its terms. Balthes argues that Appellees held out to him that, if he agreed to help improve production lines 5, 7, and 8, they would dismiss their lawsuit, that he and Eshragh shook hands to consummate the contract, and that this exchange established an oral contract settling the lawsuit. Balthes further argues that there was a clear meeting of the minds shown by Eshragh's statements that Concept needed Balthes's services immediately and his statement to Foote to instruct legal counsel to dismiss the suit; that Balthes's immediate actions and his working with Ellis to develop a task list were in line with what his obligations were under the May agreement; and that the parties' conduct after May 6, 2011 demonstrates that an oral contract was formed, including that he went to work immediately, that he had several conversations with Eshragh and Concept and spent May 10, 2011 on-site addressing production problems, and that during that time he diagnosed problems and recommended steps to improve production.

Balthes also argues: "Concept was a happy customer and [had] an improved production line. The immediate fixes were completed. They had what they needed. It was then that they told [Balthes] not to come again until he signed their written agreement, and then issued their proposed written terms to [Balthes] to tie up loose legal

11

ends" and that "[t]he written terms went well beyond the scope of what the parties agreed to on May 6." Appellant's Brief at 13-14. Balthes also argues that the May 6, 2011 oral agreement is enforceable even if it omitted certain details or failed to specify a definite time for performance and that the agreement did specify a definite scope of services. Balthes further contends that his reliance on Appellees' numerous representations that an agreement was reached estops them from denying the existence of the May 6, 2011 agreement. Balthes asserts that "[e]very action [Appellees] took toward [him] was designed to induce [him] to rely on their promises," that he "was assured numerous times that they had reached a deal," and that "[f]rom May 6 through May 10, [he] was in constant contact with [Appellees] and was either talking with them about work or his wife's health." Id. at 19. Balthes also argues, in the alternative, that genuine issues of material fact as to the existence and terms of the May 2011 agreement preclude summary judgment in favor of Appellees.

Appellees maintain that it is undisputed that Balthes breached the 2010 Settlement Agreement and that the court correctly concluded that the parties did not reach an agreement in May 2011 that would modify, alter or discharge Balthes's duties under the 2010 Settlement Agreement. Appellees assert that the parties engaged in negotiations but never reached a binding agreement. Appellees further argue Balthes cannot establish the elements necessary to prevail on a theory of promissory estoppel. In his reply brief, Balthes argues that he was not advised on May 6, 2011 that the verbal agreement settling the lawsuit was contingent upon additional and onerous terms to be included in a subsequent written settlement agreement, that his affidavit in the designated evidence is

12

not self serving and can defeat summary judgment, that he relies upon other designated evidence as well as his affidavit, that the existence of a contract is a question of fact, and that he can establish the elements necessary to prevail on a theory of promissory estoppel.

Under Michigan law, a valid contract requires mutual assent on all essential terms. Eerdmans v. Maki, 573 N.W.2d 329, 332 (Mich. Ct. App. 1997). Mere discussions and negotiation cannot be a substitute for the formal requirements of a contract. Id. Before a contract can be completed, there must be an offer and acceptance. Id. Acceptance must be unambiguous and in strict conformance with the offer. Id. A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind. Kloian v. Domino's Pizza, LLC, 733 N.W.2d 766, 771 (Mich. Ct. App. 2006). An offer is a unilateral declaration of intention, and is not a contract. Kamalnath v. Mercy Memorial Hosp. Corp., 487 N.W.2d 499, 503 (Mich. Ct. App. 1992). A contract is made when both parties have executed or accepted it, and not before. Id. A counter proposition is not an acceptance. Id. Mere discussions and negotiation, including unaccepted offers, cannot be a substitute for the formal requirements of a contract. Id. "In an appropriate case an agreement may be enforced as a contract even though incomplete or indefinite in the expression of some term, if it is established that the parties intended to be bound by the agreement, particularly where one or another of the parties has rendered part or full performance." JW Knapp Co. v. Sinas, 172 N.W.2d 867 (Mich. Ct. App. 1969).

Under Indiana law, the basic requirements for a contract are offer, acceptance, consideration, and a meeting of the minds between the contracting parties on all essential

13

elements or terms of the transaction. Fiederlein v. Boutselis, 952 N.E.2d 847, 856 (Ind. Ct. App. 2011). There must be mutual assent or a meeting of the minds on all essential elements or terms in order to form a binding contract. Bennett v. Broderick, 858 N.E.2d 1044, 1048 (Ind. Ct. App. 2006), trans. denied. To be valid and enforceable, a contract must be reasonably definite and certain. Conwell v. Gray Loon Outdoor Mktg. Grp., Inc., 906 N.E.2d 805, 813 (Ind. 2009); Wenning v. Calhoun, 827 N.E.2d 627, 629 (Ind. Ct. App. 2005) ("In order to be enforceable, a contract must be reasonably definite and certain in its material terms so that the intention of the parties may be ascertained."), trans. denied. Further, "[t]he law is well established that a mere agreement to agree at some future time is not enforceable." Wolvos v. Meyer, 668 N.E.2d 671, 674 (Ind. 1996); see also Block v. Magura, 949 N.E.2d 1261, 1266 (Ind. Ct. App. 2011). While parties may make an enforceable contract which obligates them to execute a subsequent final written agreement, it is necessary that the agreement was expressed on all essential terms to be incorporated in the document and that the document is understood to be a mere memorial of the agreement already reached. Id. at 674-675 (citing 1 ARTHUR LINTON CORBIN AND JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 2.8 at 133-34 (rev. ed. 1993)). We consider the parties' "intent to be bound" as a question separate from but related to the definiteness of terms. Block, 949 N.E.2d at 1266.

The designated evidence reveals a number of affidavits, e-mail messages, and other documents related to the 2010 Settlement Agreement, the May 6, 2011 meeting, and the parties' correspondence and negotiations after the May 6, 2011 meeting. In his affidavit, Foote stated that it was among his duties to track the loan payments to Balthes

14

and calculate the amount accruing on the loans, that as of April 30, 2010 Balthes owed a total of $57,544.54, that Balthes voluntarily resigned his employment effective March 31, 2010, that Balthes subsequently signed an agreement promising to pay back $50,000 in two payments, and that Balthes made one payment of $5,000 and has failed to make any subsequent payments. In his affidavit, Eshragh stated that in 2010 Balthes and Appellees reached an agreement to repay the amounts he owed and that he received a sole payment from Balthes for $5,000.

In his affidavit, Balthes stated that he signed the 2010 Settlement Agreement on the belief that he would receive a loan to make the payments to Concept stated in the agreement upon the sale of his house in Michigan, that he did not receive sufficient funds from the sale and was unable to get a loan to make the payments under the agreement, and that he made a payment of $5,000. Balthes stated that in February 2011 he learned that his wife had cancer, that he advised counsel for Appellees of this fact and of the need for his resources to be used for her medical necessities, and that in response Appellees asked to have a meeting. Balthes stated that on or about May 6, 2011, he drove from Elkhart and met with Ellis, Foote, and Eshragh in Grand Rapids, Michigan, that at the meeting he was advised that Appellees would like to find a way to use his expertise in helping Concept get various production lines functioning better or just functioning, that Concept specifically needed help with lines 7 and 8 so they could get these lines operational enough to run cotton shoddy, and that Concept also needed help with line 5. Balthes stated that Ellis described in detail what Appellees needed him to do to help Concept to improve the production lines, namely, that Appellees needed help with lines

15

5, 7 and 8, that Ellis later suggested they may need help with lines 2 and 3, and that Balthes was agreeable to helping Appellees with production lines 5, 7, and 8 as outlined by Ellis, knowing that the lawsuit and claims were being dropped as stated by Eshragh. Balthes also stated that Eshragh then restated that based on Balthes's offer to help Appellees, Eshragh would fully drop the suit and the claims for money owing, that Eshragh instructed Foote to notify their lawyer to notify the courts that claims were being dropped, and that he stood up and shook Eshragh's hand accepting the agreement. Balthes stated that Eshragh took him on a tour of a building, stated that he was happy the lawsuit was over and that they had reached an agreement, and that the two again shook hands. Balthes stated that the following day, Eshragh called him to tell him again how relieved he was that the suit was over and that Eshragh called him a couple more times after that to talk about general things and how his wife was doing.

Balthes's affidavit further stated that, in reliance upon the agreement the parties reached on May 6, 2011, he returned the following Tuesday to start work, that he met briefly with Eshragh, Foote, and Ellis, and that Foote thought it would be a good idea to put the parties' agreement in writing and said he would send something to Balthes to review. Balthes stated that he met with the production manager and some production staff to begin his work and review and evaluate the performance of lines 7 and 8, that he evaluated the line issues people were having, that the production team was happy he was there and able to help, that he and the others reviewed basic fixes that Concept needed to do to improve line performance, and that he made major suggestions for changes to lines 7 and 8 that were implemented by Concept almost immediately. Balthes stated that he

16

returned to the office with Ellis and the production team, that Eshragh wanted to make sure that the Concept staff were following Balthes's recommendations, and that they set up a program for repairs scheduled to begin that Friday and Saturday with a follow-up trip scheduled for the following week. Balthes stated that, as he left, Eshragh walked him to the door and restated his position that the suit was forever gone and that he was very glad he was there helping Concept, that they again shook hands, and that Eshragh called him several times after that to confer. Balthes stated that around May 13, 2011, after he had provided his expertise to Appellees, Ellis advised that Balthes should not come up and do further work until a written agreement was in place and that the written agreement that was presented to him was not representative of what the parties had agreed to in the meeting on May 6, 2011, and included material terms that had not been discussed or agreed to and had not been signed.

In his supplemental affidavit, Eshragh stated that Concept had been prepared to hire a consulting firm to help improve the production and operation of its carding lines, that he knew that Balthes could also provide these services, and that he asked his attorney to reach out to Balthes to see if it was worth exploring this settlement avenue. Eshragh stated that he met with Balthes on May 6, 2011, to discuss the possibility of him performing some consulting work for Concept in exchange for dismissal of its lawsuit and that Ellis explained the company's needs to Balthes. Eshragh stated that, while Balthes was agreeable to performing the work, there were details to be worked out, including the scope and amount of work to be performed and Balthes's obligations under non-competition agreements with both Concept and another company. Eshragh further

17

stated that following the meeting the attorneys for both sides exchanged various proposals, that he remembered that the issues discussed centered around the scope of services and the terms of restrictive covenants, that Balthes rejected Appellees' proposal and likewise Balthes's proposal was unacceptable to Appellees, and that the parties were unable to reach an agreement. Eshragh also stated that on May 24 he had another telephone conversation with Balthes in a final attempt to work out the differences and reach an agreement, that based on that conversation he instructed his attorney to revise Appellees' settlement proposal and forward it to Balthes for his review, that Balthes rejected Appellees' final offer on June 2, 2011, and that there were no further negotiations since that date.

In his affidavit, Ellis stated that during the May 6, 2011 meeting, he explained the services Concept needed Balthes to provide and that he and Balthes exchanged ideas at the meeting of possible improvement to Concept's carding lines. Ellis stated that no agreement was reached regarding the number of consulting hours Balthes would provide or the scope of his services. Ellis stated that on May 9, 2011, in anticipation of the parties reaching an agreement, he generated a task list for Balthes and proposed schedule, that Balthes suggested that he visit Concept's plant on May 10, 2011 to observe the operation, that Ellis confirmed in an e-mail to Balthes that the remainder of the consulting would have to wait because the parties were still "closing the loop" on the settlement agreement, and that Balthes nevertheless still visited Concept's facility on May 10. Appellant's Appendix at 95. Ellis further stated that on May 12, 2011, he sent Balthes an e-mail stating that until the legal agreement had been signed he should not

18

visit the facility, that Balthes agreed and stated that he hoped the parties could reach an agreement by that Friday, and that on May 19, 2011, Ellis received an e-mail from Balthes regarding scheduling a visit to Concept's plant in which Balthes wrote that "[i]n case the legal issues get resolved this week wanted to let you know next week I only have Tuesday open." Id. at 96.

The designated evidence includes the May 9, May 12, and May 19, 2011, e-mail messages referenced in Ellis's affidavit. In the Monday, May 9, 2011 e-mail message, Ellis wrote in part that "Tuesday is a good fit," that "[w]e will be running Cotton Shoddy on 7 & 8 and it will give you a good chance to see the baseline of where the machine is performing as well as see the raw material we are running and issues it is presenting," that "[f]rom there we can map out a plan for how to dial in the process and equipment," and "[t]here was some talk in our meeting about closing the loop on some legal stuff - I'll leave that to [Eshragh] and [] Foote. Let's you and I concentrate on generating a task list and a work schedule to get it done," and "Give me a call on my cell and let me know what time you plan on arriving Tuesday and how long you can stay and we'll get started." Id. at 97. On May 12, 2011, Ellis wrote to Balthes and stated that Foote let him know that he is "still working through the details of your agreement with [Eshragh]," that "[i]t probably makes sense to hold off your next visit until this is done," and that "[w]e are making the adjustment we discussed on Tuesday and our ship schedule has been pushed out a little, so hopefully you guys get the legal end wrapped up without too much impact to the overall schedule." Id. at 98. Balthes sent a reply e-mail on May 12, 2011 stating in part: "I hope it's done today or at least by Friday." Id.

19

In his affidavit, Ripple stated that he represented Appellees in the lawsuit, that on May 6, 2011, Balthes met with Eshragh and other representatives of Concept and that Eshragh informed Ripple that Balthes had agreed in principle to exchange consulting services for a dismissal of the lawsuit pending the negotiation and execution of a settlement agreement. Ripple stated that on May 11, 2011, he sent a draft settlement agreement to Balthes containing Appellees' original offer to settle, that the same day Balthes notified him that changes needed to be made before he could agree to it, particularly with respect to the non-competition and non-solicitation language in the agreement, and that Balthes suggested revisions to the language. Ripple stated that, on May 12, 2011, after consultation with Appellees, he sent an e-mail to Balthes indicating that Appellees considered Balthes's changes to the restrictive covenant to be a "potential deal-breaker," that he received no response to that e-mail message but had a conversation with the attorney who had represented Balthes in negotiating the 2010 Settlement Agreement, and that Balthes's attorney reiterated Balthes's concerns regarding the covenants and the scope of services. Ripple stated that on May 19, 2011, counsel for Balthes informed him that he would be providing a revised settlement agreement the following day and that on May 20, 2011, Balthes's counsel forwarded a "red-line" version of the settlement agreement that incorporated Balthes's revised changes to the agreement. Id. at 101. Ripple stated that on May 21, 2011, he responded and communicated Appellees' rejection of the May 20 proposal and that Appellees countered by stating that their original May 11 offer remained on the table until May 23, 2011. Ripple further stated that on May 24, 2011, Balthes and Eshragh discussed the settlement

20

agreement by telephone, that Ripple forwarded to Balthes that same day a revised settlement agreement incorporating the changes discussed on the phone, that the new revised agreement more clearly provided the scope of the project and Balthes's duties and clarifications regarding travel and supplies, and that later that day Balthes informed Ripple that he "did not commit" to any of the changes in the May 24, 2011 revised settlement agreement and that his attorney would need to review the proposal. Ripple stated that on June 2, 2011, he spoke with Balthes's counsel regarding the proposed May 24, 2011 agreement, that Balthes's counsel stated unequivocally that the "offer was rejected" and that Balthes could not agree to the scope of services to be provided, the restrictive covenants, and Concept's proposed remedies in case of default. Id. at 101. Ripple finally stated that following Balthes's rejection of Appellees' May 24, 2011 proposal, neither Balthes nor Appellees have made subsequent settlement offers and that Balthes has not at any time agreed to the proposed settlement agreement provided to him.

The designated evidence includes the May 11, May 12, May 20, May 21, and May 24, 2011, e-mail messages referenced in Ripple's affidavit. The May 11, 2011 e-mail exchange shows that Ripple sent Balthes drafts of the settlement documents and that Balthes informed Ripple that changes were required, that he had a long history of working in the industry and that "[t]he restrictive provisions in the agreement basically kills any chance for me to continue working and earn and [sic] income" and that he could not work "under these conditions and these provision[s] will need to be changed." Id. at 103. In an e-mail message on May 12, 2011 from Ripple to Balthes, Ripple explained that the restrictive covenant language in section 6 of the draft agreement and

21

confidentiality provisions in section 7 are "very important to [Eshragh] and Concept," that the language in the draft "contains the exact same restrictions and provisions that were included in the first [2010] Settlement Agreement you signed," that "[s]ince that Agreement is still in full force and effect, you are already bound by that language," and that Eshragh had asked Ripple to relate to Balthes that "this is a potential deal-breaker" and that he felt "strongly about this issue." Id. at 105.

The red-line version of the draft agreement forwarded by Balthes's counsel to Ripple on May 20, 2011 referenced in Ripple's affidavit is also included in the designated evidence. The red-line version highlighted the text of the language which Balthes desired to revise. Balthes's revisions included changes to the description of the consulting services to be provided by Balthes, including language related to which party would be responsible for certain expenses, the hours, time commitment, and location of Balthes's work, and the areas of his support, namely, to improve web performance related to lines 7 and 8, finalize systems for line 5, and requirements for reassembly for lines 2 and 3. Balthes's revisions also included changes to section 6 of the draft agreement related to non-competition and non-solicitation.

Ripple sent an e-mail message to Balthes and his attorney on May 21, 2011, stating that the revised terms of the revised settlement agreement were not acceptable to Concept, that they fundamentally change the nature of the parties' agreement, that the 2010 Settlement Agreement contained the non-competition and non-solicitation language originally proposed by Concept in the draft agreement, that Balthes is already bound by those restrictions, that Concept has no interest in relitigating another breach of another

settlement agreement if Balthes were to breach, that Concept is prepared to file a motion for summary judgment, and that Concept remained willing to settle on the terms initially proposed and that the offer would remain open until May 23, 2011. The May 24, 2011 e-mail message from Ripple to Balthes, his attorney, and Foote attached further revised draft settlement paperwork incorporating certain changes that Balthes discussed with Estragh earlier that day, including changes related to the scope of work and how it is measured and scope of duties and clarifications regarding travel and supplies.

The designated evidence reveals that, despite the fact that Balthes and Eshragh shook hands and Eshragh stated his intent to have Appellees' lawsuit dismissed, there was not a meeting of the minds or mutual assent regarding the terms of such an agreement and that the terms of the agreement were being discussed and negotiated following the May 6, 2011 meeting and were never finalized or concluded. See Wolvos, 668 N.E.2d at 674 (holding that a mere agreement to agree at some future time is not enforceable); Conwell, 906 N.E.2d at 813 (providing that to be valid and enforceable a contract must be reasonably definite and certain). As set forth above, the designated evidence includes affidavits and copies of e-mail messages by and between the parties and their attorneys indicating that they were in discussions and were offering proposals and counter-proposals regarding the particular terms to which both Balthes and Appellees would agree, including terms which the parties stated were important related to the scope and time commitment of the work Balthes would perform and to non-competition and non-solicitation provisions. See Kamalnath, 487 N.W.2d at 503 (providing that a counter proposition is not an acceptance and that mere discussions and negotiation, including

23

unaccepted offers, cannot be a substitute for the formal requirements of a contract). Based upon the designated evidence and under the circumstances, we conclude that it is evident that there was not a meeting of the minds on or after May 6, 2011 regarding the terms of any proposed agreement between the parties for Balthes to perform consulting work and in exchange for Appellees to dismiss their action against him. Accordingly, the court did not err in entering summary judgment in favor of Appellees and against Balthes on the issue of whether an agreement regarding the dismissal of Appellees' action against Balthes in exchange for the performance of certain consulting work was reached on or after May 6, 2011. See East Porter Cnty. Sch. Corp. v. Gough, Inc., 965 N.E.2d 684 (Ind. Ct. App. 2012) (concluding that there was not a meeting of the minds and affirming the trial court's entry of summary judgment).

However, we reach a different conclusion as to the propriety of summary judgment as to Balthes's argument of promissory estoppel. Balthes argues that his reliance on Appellees' representations that an agreement was reached estops Appellees from denying the existence of the May 6, 2011 agreement. Balthes argues that it would be unjust to allow Appellees to benefit freely from work he did on their behalf. Under Michigan law, the elements of a promissory estoppel claim "consist of (1) a promise (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee and (3) that, in fact, produced reliance or forbearance of that nature (4) in circumstances requiring enforcement of the promise if injustice is to be avoided." Zaremba Equip., Inc. v. Harco Nat'l Ins. Co., 761 N.W.2d 151, 166 (Mich. Ct. App. 2008). Under Indiana law, promissory estoppel "is a judicial

24

doctrine sounding in equity." Brown v. Branch, 758 N.E.2d 48, 51 (Ind. 2001). Specifically, promissory estoppel "encompasses the following elements: (1) a promise by the promissor; (2) made with the expectation that the promisee will rely thereon; (3) which induces reasonable reliance by the promisee; (4) of a definite and substantial nature; and (5) injustice can be avoided only by enforcement of the promise." Id. at 52. The doctrine of promissory estoppel is part of the "concept by which one's own acts or conduct prevents the claiming of a right to the detriment of another party who was entitled to and did rely on the conduct." Id.

In their affidavits, Eshragh and Ellis stated that Balthes was advised at the May 6, 2011 meeting of the services needed by Concept but that no agreement was reached and that there were details to be worked out related to the scope and amount of work and the non-competition terms. On May 9, 2011, Ellis sent an e-mail message to Balthes stating in part that "Tuesday is a good fit," that "[w]e will be running Cotton Shoddy on 7 & 8 and it will give you a good chance to see the baseline of where the machine is performing as well as see the raw material we are running and issues it is presenting," that "[f]rom there we can map out a plan for how to dial in the process and equipment," and "[t]here was some talk in our meeting about closing the loop on some legal stuff - I'll leave that to [Eshragh] and [] Foote. Let's you and I concentrate on generating a task list and a work schedule to get it done," and "Give me a call on my cell and let me know what time you plan on arriving Tuesday and how long you can stay and we'll get started." Id. at 97. On May 11, 2011, Ripple sent an e-mail message to Balthes with drafts of the settlement documents. Later that day, Balthes sent a reply e-mail message to Ripple stating that

25

"[t]here are some changes required," that he had a long history of working in the industry, and that "[t]he restrictive provisions in the agreement basically kills any chance for me to continue working and earn and [sic] income" and that he could not work "under these conditions and these provision[s] will need to be changed." Id. at 103. On May 12, 2011, Ellis sent an e-mail to Balthes and stated that he was aware that Balthes was still working through the details of the agreement and that it made sense to hold off the next visit until after the agreement was done.

On the other hand, in his affidavit, Balthes stated that at the May 6, 2011 meeting, he was advised that Appellees would like to find a way to use his expertise in helping Concept get various production lines functioning better or just functioning, and that Concept specifically needed help with lines 7 and 8 so they could get these lines operational enough to run cotton shoddy, and that Concept also needed help with line 5. Balthes stated that Ellis described in detail what Appellees needed him to do, namely, that Appellees needed help with lines 5, 7 and 8, that Ellis later suggested they may need help with lines 2 and 3, and that Balthes was agreeable to helping Appellees with production lines 5, 7, and 8 as outlined by Ellis. Balthes stated that Eshragh stated that he was happy the lawsuit was over and that they had reached an agreement and that he and Eshragh shook hands. Balthes further stated that, in reliance upon the agreement the parties reached on May 6, 2011, he returned the following Tuesday to start work, that he met briefly with Eshragh, Foote, and Ellis, and that Foote thought it would be a good idea to put the parties' agreement in writing and said he would send something to Balthes to review. Balthes stated that he met with the production manager and some production

26

staff to begin his work and review and evaluate the performance of lines 7 and 8, that he evaluated the line issues people were having, that the production team was happy he was there and able to help, that he and the others reviewed basic fixes that Concept needed to do to improve line performance, and that he made major suggestions for changes to lines 7 and 8 that were implemented by Concept almost immediately. Balthes stated that Eshragh wanted to make sure that the Concept staff were following his recommendations and that they set up a program for repairs scheduled to begin that Friday and Saturday with a follow-up trip scheduled for the following week. Balthes stated that, as he left, Eshragh walked him to the door and restated his position that the suit was forever gone and that he was very glad he was there helping Concept, that they again shook hands, and that Eshragh called him several times after that to confer.

Based upon the designated evidence, and keeping in mind that any doubt as to the existence of an issue of material fact or an inference to be drawn from the facts must be resolved in favor of the nonmoving party, we conclude that there exists a material question of fact as to Balthes's promissory estoppel defense or claim, and accordingly summary judgment is precluded as to this issue. We remand to the trial court for further proceedings on this specific defense or claim and the extent, if any, to which Balthes may be entitled to reliance damages or to an offset of his obligations under the 2010 Settlement Agreement due to the time and expertise he may have provided to Appellees between May 6, 2011 and May 11, 2011. See Jarboe v. Landmark Community Newspapers of Indiana, Inc., 644 N.E.2d 118, 122 (Ind. 1994) (noting that Indiana draws a line between expectation damages and reliance damages and holding that the remedy

where the doctrine of promissory estoppel may be available "is limited to damages actually resulting from the detrimental reliance"), reh'g denied; Hrezo v. City of Lawrenceburg, 934 N.E.2d 1221, 1231 (Ind. Ct. App. 2010) ("A successful party is entitled to reliance damages only."), trans. denied.

For the foregoing reasons, we reverse in part the trial court's summary judgment ruling and remand for further proceedings consistent with this opinion on the sole issue of Balthes's promissory estoppel defense or claim, and in all other respects we affirm the court's ruling.

Affirmed in part, reversed in part, and remanded for further proceedings.

BAKER, J., and KIRSCH, J., concur.