

IN THE

# Court of Appeals of Indiana

Sharon Parsons, as Personal Representative of the Estate of
Timothy Parsons, et al.,

*Appellants-Plaintiffs*

FILED

Jun 22 2026, 9:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

Crum & Forster Specialty Insurance Company,

*Appellee-Defendant*

and

Danielle Benjamin, et al.,

*Defendants*

---

June 22, 2026

Court of Appeals Case No.
25A-CT-2307

Appeal from the LaPorte Superior Court

The Honorable Richard R. Stalbrink, Judge

---

**Opinion by Judge DeBoer**
Judges Brown and Altice concur.

**DeBoer, Judge.**

## Case Summary

[1] Massachusetts resident Timothy Parsons died from methanol poisoning after drinking Ethanol Extraction, a product sold by an Indiana-based chemical processing facility that claimed it contained 190 proof ethanol. When Parsons' parents and his estate[1] filed a wrongful death action, the facility's commercial insurance carrier, Crum & Forster Specialty Insurance Company (Crum & Forster), determined the presence of methanol in the product was a "pollutant" that was excluded from the policy's Commercial General Liability (CGL) coverage part but qualified for coverage under a separate Third-Party Pollution Liability (TPPL) part. After the Parsons learned of Crum & Forster's coverage position, they filed a declaratory judgment claim asserting a right to CGL coverage. The parties filed cross-motions for summary judgment on that claim,

---

[1] In this opinion, we collectively refer to Parsons' estate and his parents as "the Parsons."

and the trial court ultimately entered judgment in Crum & Forster's favor after finding the TPPL coverage part applied and the CGL part did not.

[2] The Parsons appeal, arguing their son's death was not caused by a pollution condition as defined by the Crum & Forster policy, so their claims should be covered as a products liability action under the CGL coverage part. Bound by precedent from our Supreme Court construing similar pollution provisions in insurance policies, we find that because the Crum & Forster policy did not unambiguously identify methanol as a pollutant, the trial court erred in applying the TPPL part to the Parsons' claims. *See State Auto Mut. Ins. Co. v. Flexdar, Inc.*, 964 N.E.2d 845, 851 (Ind. 2012), *reh'g denied*. Accordingly, we reverse and remand with instructions for the trial court to deny Crum & Forster's motion for summary judgment and grant the Parsons' cross-motion.

## Facts and Procedural History

[3] From 2010 to 2024, Dennis Zeedyk operated a chemical processing facility in LaPorte through an Indiana limited liability company, Glycerin Traders LLC (Glycerin Traders). Crum & Forster issued Glycerin Traders an "Environmental Policy" (the Policy) that contained numerous coverage parts, including a CGL part and a TPPL part. It also issued an excess policy that provided an additional $1,000,000 in coverage.

[4] In the fall of 2016, Zeedyk purchased roughly 6,510 gallons of denatured alcohol from a middle-man supplier who sourced it from a cargo barge cleaning

company.[2]  The barge cleaning company had combined the remnants of industrial alcohol shipments into large holding containers, resulting in a mixture that "had a noticeable pungent odor and an unusual slight-yellow color."  Appellants' Appendix Vol. 3 at 218.  The bill of lading for the alcohol delivered to Zeedyk indicated the mixture was comprised of several industrial alcohols and additives.  Without performing any tests to confirm the contents of the mixture, Zeedyk and his employees set up a bottling line to distill and package it for resale.  Zeedyk had to distill the mixture multiple times to remove the pungent odor and yellow tint from the final product, which he intended to market as safe for human consumption.

[5]  Eighteen days after receiving the shipment, Zeedyk sold the first bottle of a product he called "Ethanol Extraction."[3]  *Id.* at 186.  Ethanol Extraction was initially sold by Glycerin Traders, but Zeedyk created a new entity in early 2017 to take over marketing and distribution.  He called that company Lake Michigan Distilling Company LLC (Lake Michigan Distilling).  The product was erroneously labeled as containing "190 proof non-denatured grain alcohol[,]" and Lake Michigan Distilling marketed it "as consisting of 95% ethyl alcohol (also known as ethanol) and 5% purified water."  *Id.* at 187; *see*

---

[2] Denatured alcohol is ethanol mixed with toxic additives such as methanol.  It can be used for industrial purposes but is not safe for human consumption.

[3] Ethanol can be used as a solvent to extract compounds from plant material in a process called ethanol extraction.  Ethanol extraction is a popular method for obtaining THC and CBD from cannabis, but can also be used to extract flavors, colors, and soluble compounds for use in food or medicine.

*infra Figure 1*. In truth, it contained high levels of methanol, which is toxic and potentially lethal if consumed.



*Figure 1:* Appellant's App. Vol. 3 at 199.

[6] In March 2018, Timothy Parsons purchased a few bottles of Ethanol Extraction and had them shipped to his home in Massachusetts. Two weeks later, his mother took him to the hospital after finding him in distress and begging for help. Parsons' medical providers initially believed he was suffering from ethanol poisoning, but his bloodwork instead indicated he had lethal levels of methanol in his system. While in the hospital, Parsons had seizures and ultimately suffered a severe brain injury. He was declared brain dead on April 6, 2018, and he died that same day from "complications of acute methanol intoxication." *Id.* at 213.

[7] The day Parsons died, a Massachusetts Poison Control representative called Lake Michigan Distilling to advise it that one of its customers suffered

methanol poisoning. That call prompted Zeedyk to send a sample of Ethanol Extraction for testing, which revealed it contained 42.7% methanol and 54.6% ethanol. Despite this information, Zeedyk did not issue a recall for the product until May 22, 2018, and then he only did so because he was facing pressure from federal and Indiana authorities to recall the product. A subsequent investigation determined several purchasers of Ethanol Extraction had died or been seriously injured after ingesting it.

[8] In August 2018, Crum & Forster received notice of two lawsuits filed against Zeedyk and his companies.[4] One of those suits was filed by the Estate of Nisa Baxter, a Nevada woman who died after eating THC brownies made using Ethanol Extraction. The second was filed by Keenan Jefferson, a Missouri man who suffered non-fatal injuries after consuming the product and sought to certify a class action. Then, in February 2019, Crum & Forster received notice of a third claim against Zeedyk, his companies, and other individuals allegedly involved in producing Ethanol Extraction. That claim was brought by Jacob Shanbrom, who alleged he suffered partial vision loss after drinking nearly a gallon of Ethanol Extraction over the course of several months.

[9] In its initial coverage determinations for these claims, Crum & Forster disclaimed coverage (including under the CGL and TPPL coverage parts), but agreed to defend Zeedyk and the businesses subject to a reservation of rights. It

---

[4] Though the Policy was issued only to Glycerin Traders, the parties agree (or at least do not dispute) that Lake Michigan Distilling was also an insured.

cited a "Total Pollution Exclusion" as the reason CGL coverage was unavailable. As for TPPL coverage, Crum & Forster determined, among other things, that Glycerin Traders had not submitted timely claims under the TPPL coverage part. It later reconsidered its position and agreed that the presence of methanol in Ethanol Extraction was a covered "pollution condition" for purposes of TPPL coverage, and that it had received timely notice of the claims.

[10] The CGL part of the Policy provided, as relevant here:

> We[5] will pay, in excess of the Deductible shown in the Declarations, those sums that the insured becomes legally obligated to pay as "damages" for "bodily injury" or "property damage" to which this insurance applies.

Appellants' App. Vol. 2 at 155. This included any "products-completed operations hazard" (PCOH), meaning "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' . . . ."[6] *Id.* at 150. However, a "Total Pollution Exclusion" endorsement excluded from CGL coverage any claim

> based upon or arising out of:

---

[5] As used in the Policy, "we" and "us" referred to Crum & Forster, while "you" and "your" referred to the insureds.

[6] PCOH clauses have been interpreted by our Supreme Court "to describe 'claims arising from the placement of defective goods into the stream of commerce by the insured.'" *West Bend Mut. Ins. Co. v. U.S. Fidelity & Guar. Co.*, 598 F.3d 918, 925 (7th Cir. 2010) (quoting *B & R Farm Serv., Inc. v. Farm Bureau Mut. Ins. Co.*, 483 N.E.2d 1076, 1077 (Ind. 1985)).

. . . "Bodily injury", "property damage" or "personal and advertising injury" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape, or presence or movement of any "pollutants" at any time and any place, including, without limitation, any indoor or outdoor commercial, industrial, residential or agricultural locale, whether inhabited or uninhabited . . . .

*Id.* at 201. The common terms of the Policy defined "pollutants" as

any solid, liquid, gaseous, thermal or biological irritant or contaminant, including, without limitation, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste and any matter that by its presence, corrupts, defiles, contaminates or is harmful to the soil, air, or water, living things or the environment.

*Id.* at 150.

[11] Though excluded from CGL coverage, pollution-related claims were covered by the TPPL coverage part, in which Crum & Forster agreed to

pay, in excess of the Deductible shown in the Declarations, those sums the insured becomes legally obligated to pay:

(1) As "damages" because of "bodily injury" or "property damage", and

(2) For "cleanup costs";

resulting from a "pollution condition" that was caused by an "occurrence" and to which this insurance applies.

*Id.* at 168. The term "pollution condition" incorporated the same definition of "pollutant" as the CGL Total Pollution Exclusion and was further defined as "the discharge, dispersal, seepage, migration, release, escape, presence or movement of" any such "pollutants." *Id.* at 150. Unlike CGL coverage, PCOH coverage was not defined as applicable to the TPPL part of the Policy.[7]

[12] When the Parsons sued in March 2020, Crum & Forster—as it did with the Baxter, Jefferson, and Shanbrom claims—agreed to defend and indemnify its insureds under the TPPL coverage part. However, in June 2021, it informed Zeedyk that the TPPL policy limits and the limits of the excess policy had been exhausted by defense costs and prior settlements. In response, Glycerin Traders' counsel sent a letter to Crum & Forster asserting the Parsons' claims qualified for CGL coverage. However, Crum & Forster argued CGL coverage was unavailable for the Parsons' claims because Glycerin Traders had previously accepted TPPL coverage and the Policy's Multiple Coverages Limitation provided that even if there were concurrent CGL and TPPL coverage, only the TPPL part would apply. Specifically, under the Multiple Coverages Limitation,

> If . . . the [TPPL] Coverage Part . . . appl[ies] to an "occurrence", offense, "wrongful act" or "pollution condition" or related "occurrences", offenses, "wrongful acts" or "pollution conditions", then the [CGL] . . . Coverage Part shall not apply to

---

[7] The Policy's common terms defined PCOHs as applied to CGL coverage and a Contractors Pollution Liability coverage part, but not in relation to the TPPL part. *See* Appellants' App. Vol. 2 at 150.

the same or related "occurrences", offenses, "wrongful acts" or "pollution conditions".

*Id.* at 140.

[13] When the Parsons learned Crum & Forster was no longer providing Zeedyk and his companies with a defense, they amended their complaint to assert a declaratory judgment claim seeking CGL coverage. Thereafter, Crum & Forster moved for summary judgment on that claim and asked the court to declare it did "not owe an obligation to indemnify Glycerin Traders . . . or any other [insured] . . . for any losses, damages, claims, settlements[,] or judgments asserted by [the Parsons] . . . ." *Id.* at 79. It argued that "pursuant to the clear and unambiguous language of the . . . Policy, all claims which arise out of the same or a related 'pollution condition' are subject to the [TPPL policy limit], and . . . $1,000,000 . . . *is the most [Crum & Forster] will pay* under the [TPPL] Coverage Part . . . ." *Id.* at 72. Furthermore, "Glycerin Traders identified [that] the 'pollution condition' giving rise to the [Ethanol Extraction-related] claims 'can be traced back to a single 7,000-gallon container of ethanol that [it] purchased believing it was pure . . . .'" *Id.* at 74. Then, after Glycerin Traders accepted TPPL coverage, the limits of the TPPL part and the excess policy were exhausted by settlements and defense costs. Finally, according to Crum & Forster, "pursuant to the operation of the Multiple Coverages Limitation . . . , it [was] undisputed that the [CGL] Coverage Part . . . does not afford additional coverage . . . ." *Id.* at 79.

The Parsons opposed Crum & Forster's motion and filed a cross-motion for summary judgment. They argued the TPPL coverage part did not apply to their claims because Zeedyk and his companies had not "create[ed] a 'pollution condition' or [had] 'pollutants' migrate from their premises." Appellants' App. Vol. 3 at 154. Instead,

> [Lake Michigan Distilling] manufactured, bottled, packaged, sold, and delivered [a] *completed*, albeit defective, Ethanol Extraction product . . . , all while marketing the product as safe for human consumption . . . .
>
> Given these facts, . . . the Parsons' claim is a [PCOH] claim under the [CGL] Coverage Part . . . .

*Id.* For their part, Zeedyk and his companies opposed Crum & Forster's motion and argued,

> The Total Pollution Exclusion does not operate to exclude coverage of any of the claims at issue here because the language of the exclusion is ambiguous and unenforceable. *See* [*Flexdar*, 964 N.E.2d 845]. [Crum & Forster's] erroneous reliance on the Total Pollution Exclusion in 2018 when Glycerin Traders first gave notice of a claim does not change the fact that Glycerin Traders had, and still has, coverage under the CGL Coverage Part based on the terms of the policy and Indiana law. [Crum & Forster's] attempt to recast the coverage as falling under the TPPL Coverage Part is a red herring. From the beginning, Glycerin Traders has had coverage for all claims under the CGL

Coverage Part[,] and it is entitled to such coverage for the Parsons['] claim[s].[8]

As for Crum & Forster's contention that Zeedyk "'admitted' that the Parsons['] claim[s] arise[] out of the same pollution condition as the" other three Ethanol Extraction claims, Zeedyk and his companies argued,

> [Crum & Forster's] motion for summary judgment doubles down on its initial determination in 2018 that the Total Pollution Exclusion applies and excludes coverage under the CGL Coverage Part. Based on that initial, erroneous determination, [Crum & Forster] only offered to defend and indemnify Glycerin Traders under the TPPL Coverage Part. . . . Glycerin Traders was in no position to refuse a defense under the TPPL [part] and insist that [Crum & Forster] defend it under the CGL Coverage Part, which [Crum & Forster] had insisted, from the beginning, provided no coverage.
>
> . . . . [Crum & Forster] fails to see the unfairness to its insured under these circumstances and instead expects Glycerin Traders to be bound by [Crum & Forster's] erroneous coverage analysis. If [Crum & Forster] had correctly analyzed coverage in 2018 when the first claim was made, then [it] would have defended and indemnified Glycerin Traders under the CGL Coverage Part.

---

[8] Glycerin Traders' Response in Opposition to Crum & Forster's Motion for Summary Judgment at 3, *Parsons Est. v. Lake Mich. Distilling Co.* (May 21, 2024) (No. 46D02-2003-CT-471).

Neither the Parsons nor Crum & Forster included a copy of this document in their respective appendices. Nonetheless, it is a part of the record on appeal. *See* Ind. Appellate Rule 27 ("The Record on Appeal shall consist of the Clerk's Record and all proceedings before the trial court . . . , *whether or not transcribed or transmitted to the Court on Appeal.*") (emphasis added).

> The Court should put the parties in the position they would have been in had the correct coverage been identified from the start.[9]

In a combined brief supporting its motion for summary judgment and opposing the Parsons' cross-motion, Crum & Forster defended its determination that the claims at issue fell under the TPPL coverage part. It argued that under the Policy,

> "pollution condition" includes the "presence of pollutants." "Pollutant" is defined in pertinent part as "chemicals . . . and any matter that by its presence . . . is harmful to . . . living things . . . ." Here, methanol was present, which was harmful, in fact lethal, to humans. . . . Consequently, the terms of the TPPL [coverage part] are met.

Appellants' App. Vol. 4 at 9 (citations omitted). It also asserted "Glycerin Traders ha[d] accepted a defense and indemnification under the TPPL coverage part" in connection with all four claims and could not therefore assert a right to CGL coverage "[a]fter having obtained the benefit of a defense and/or settlement of these claims . . . ." *Id.* at 11. Finally, Crum & Forster argued the enforceability (or lack thereof) of the Total Pollution Exclusion was irrelevant to its summary judgment motion because it never

---

[9] Glycerin Traders' Response in Opposition to Crum & Forster's Motion for Summary Judgment, *supra* note 8, at 3-4 (footnote omitted).

asserted that the [exclusion] precludes coverage[10] . . . and did not even mention the Total Pollution Exclusion in its motion for summary judgment. Rather, . . . since coverage [was] afforded for the Parsons['] claim[s] under the TPPL coverage part . . . , pursuant to the operation of the Multiple Coverages Limitation . . . , the CGL Coverage Part . . . does not afford additional coverage . . . .

*Id.* at 15-16 (footnote omitted).

The trial court held a hearing on the motions for summary judgment on August 22, 2024. Then, on February 11, 2025, the court issued its detailed order granting Crum & Forster's motion for summary judgment and denying the Parsons' cross-motion. It issued findings of fact and conclusions of law in which it reasoned, in part,

> 2. On August 14, 2024, this Court issued an order on summary judgment related to choice of law and held that the substantive law of Massachusetts will apply in this matter. . . .
>
> . . . .
>
> 12. [Glycerin Traders and Lake Michigan Distilling] distilled, bottled, and sold Ethanol Extraction . . . from October 2016 to May 2018. [They] used bulk denatured alcohol

---

[10] Crum & Forster's claim that it *never* asserted the Total Pollution Exclusion bars CGL coverage is difficult to square with its assertion in a September 20, 2018 coverage determination letter that it "relie[d] on the Total Pollution Exclusion to disclaim coverage and deny liability under the CGL coverage part" for the Ethanol Extraction claims. Appellants' App. Vol. 3 at 31.

containing mixed solvents, including methanol, to make [their] product . . . .

. . . .

14. On August 6, 2018, [Crum & Forster] received notice . . . of a lawsuit filed against [Zeedyk's companies], . . . asserting claims in connection with the death of Ni[s]a Baxter following her use of [Ethanol Extraction] . . . . [Crum & Forster] agreed to provide a defense to Glycerin Traders in the Baxter Action under the [TPPL] coverage part . . . . [Crum & Forster] agreed to settle the claims asserted . . . in the Baxter Action, which exhausted the limits of liability under the [TPPL] coverage part . . . and a portion of the limits provided under the Excess Policy.

15. On August 15, 2018, [Crum & Forster] received notice . . . of a class action lawsuit . . . asserting claims in connection with bodily injuries sustained by Keenan Jefferson and others from the methanol contained in Ethanol Extraction. Again, [Crum & Forster] agreed to provide a defense . . . under the [TPPL] coverage part . . . . [Crum & Forster] agreed to settle the claims asserted . . . in the Jefferson Action, eating into the limits of liability under the Excess Policy.

16. On January 17, 2019, [Crum & Forster] received notice of a claim by Jacob Shanbrom . . . with similar allegations as made in the Baxter and Jefferson Actions. [Crum & Forster] agreed to provide a defense . . . in connection with the Shanbrom claim under the [TPPL] coverage part . . . .

17. It wasn't until January 27, 2020[,] that [Crum & Forster] received notice of the [Parsons'] claim[s] . . . . [Crum &

Forster] agreed to provide a defense . . . in connection with the Parsons['] claim[s] under the [TPPL] coverage part . . . .

18. In an April 27, 2020 letter to [Crum & Forster], counsel for [Glycerin Traders and Lake Michigan Distilling] expressly asserted that "[the TPPL coverage part] is the relevant provision" of [the] Policy. The letter also stated, "It is clear that the Parsons['] Claim[s] arise[] out of the same pollution condition for which there was coverage under the Baxter and Jefferson claims."

19. [Glycerin Traders and Lake Michigan Distilling] ha[ve] asserted that they are also entitled to [CGL] coverage . . . .

20. This case arises out of the same "pollution condition" as the Baxter, Jefferson[,] and Shanbrom Actions and . . . the [TPPL] Coverage Part . . . applies to this case.

21. The same [TPPL] Coverage Part . . . was previously applied to the Baxter, Jefferson, and Shanbrom Actions. Pursuant to the operation of the Multiple Coverages Limitation provision, the [CGL] Coverage Part . . . does not apply to the claims asserted by [the Parsons].

22. [Crum & Forster's] payment of settlements and "defense expenses" in connection with the Baxter, Jefferson, and Parsons claims exhausted the $1,000,000 each pollution condition of liability under the [TPPL] [c]overage part . . . and the $1,000,000 each occurrence limit of liability under the Excess Policy.

23. The limits of [Crum & Forster's] coverage have been exhausted and no other coverage is afforded under the Primary and Excess Policies for this action.

24.	[Crum & Forster] owes no further obligation under the Policies to indemnify [Glycerin Traders and Lake Michigan Distilling] in connection with the claims asserted against [them] in this action.

Appellants' App. Vol. 2 at 28-33.  The Parsons now appeal.[11]

## Discussion and Decision[12]

On appeal, the Parsons contend the trial court erred in granting Crum & Forster's motion for summary judgment and denying their cross-motion.  This Court reviews a decision to grant or deny summary judgment de novo and applies the same standard as the trial court.  *Isgrig v. Trs. of Ind. Univ.*, 256 N.E.3d 1238, 1244 (Ind. 2025).  Pursuant to Indiana Trial Rule 56(C), the initial burden is on the moving party to make a "prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law."  *Id.* (quoting *Reed v. Reid*, 980 N.E.2d 277, 285 (Ind. 2012)).  If

---

[11] The Parsons filed an earlier appeal of the trial court's summary judgment order, which pended under Case No. 25A-CT-891.  On Crum & Forster's motion, the motions panel dismissed that appeal without prejudice because the court's order did not resolve all claims as to each party, was not an appealable interlocutory order as of right, and did not contain the "magic language" set forth in Trial Rule 56(C).  *See* Ind. Trial Rule 56(C) ("A summary judgment . . . with respect to less than all the claims or parties shall be interlocutory unless the court in writing expressly determines that there is no just reason for delay and in writing expressly directs entry of judgment as to less than all the issues, claims or parties.").  Thereafter, the trial court amended its order to direct the entry of final judgment on the declaratory judgment claim, and the Parsons then filed this appeal.  Additionally, though Zeedyk and his companies opposed Crum & Forster's motion for summary judgment below and asked the trial court to grant the Parsons' motion, they did not file a brief on appeal.

[12] On February 6, 2026, Crum & Forster filed a motion requesting oral argument.  We granted that motion in an order issued March 10, 2026, and scheduled an oral argument for June 8, 2026.  On June 7, lead counsel for Crum & Forster filed an emergency motion to continue the oral argument.  We granted that motion in part, cancelled the June 8 oral argument, and indicated that "[i]f the oral argument is rescheduled, the Court will do so through a forthcoming order."  Order, *Parsons v. Benjamin* (June 8, 2026) (25A-CT-2307).  Having reviewed the matter, we find that oral argument is not necessary to resolve the issues presented in this appeal.

the moving party satisfies this initial burden, "the burden then shifts to the non-moving party to come forward with evidence establishing the existence of a genuine issue of material fact." *Id.* Our review is limited "to the materials designated at the trial level." *Gunderson v. State, Ind. Dep't of Nat. Res.*, 90 N.E.3d 1171, 1175 (Ind. 2018), *cert. denied*. We construe any doubts as to the facts or reasonable inferences in favor of the non-moving party, and while the trial court's findings and conclusions "aid our review, . . . they do not bind us." *Sandoval v. Willow Lake Ests. Home Owners Ass'n*, 255 N.E.3d 1181, 1186 (Ind. Ct. App. 2025). "Generally, the interpretation of an insurance policy presents a question of law and is thus appropriate for summary judgment." *Cinergy Corp. v. Associated Elec. & Gas Ins. Servs., Ltd.*, 865 N.E.2d 571, 574 (Ind. 2007), *reh'g denied*.

[18] Our standard of review is not altered by the fact that the parties filed cross-motions for summary judgment on the same issue. *Kelley v. Med-1 Sols., LLC*, 952 N.E.2d 817, 827 (Ind. Ct. App. 2011), *trans. denied*. "Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *Shelter Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 260 N.E.3d 253, 258 (Ind. Ct. App. 2025), *trans. denied*. And because the Parsons lost on the motions below, they have "the burden of persuading us that the trial court erred." *Kluger v. J.J.P. Enters., Inc.*, 159 N.E.3d 82, 87 (Ind. Ct. App. 2020), *reh'g denied*, *trans. denied*.

## 1. Choice of Law

[19]     We begin by noting that though the parties briefed the cross-motions for summary judgment under Indiana law, the trial court held that it would interpret the Policy under Massachusetts law.[13] It based that decision on its earlier ruling that "the substantive law of Massachusetts will apply in this matter." Appellants' App. Vol. 2 at 28. However, that earlier choice of law determination focused on the damages available to the Parsons on their tort claims, not questions of contract interpretation under the Policy. Specifically, the court reasoned,

> While there is no conflict between Indiana and Massachusetts law with respect to the issue of product liability for a defective product, there is a difference between the two States with respect to the issue of recoverable damages.
>
> When this conflict occurs, the presumption is the lex loci delicti[14] rule applies. The death of Massachusetts resident, Tim Parsons[,] in Massachusetts herein is the last act in the above-captioned matter, thereby the last act occurred in Massachusetts.

---

[13] Though the trial court said it was applying Massachusetts contract principles, the court reasoned the Policy's pollution provisions were unambiguous without acknowledging rulings from the Massachusetts Supreme Judicial Court holding otherwise. *See W. Alliance Ins. Co. v. Gill*, 686 N.E.2d 997*,* 999 (Mass. 1997) (holding similarly-worded pollution provisions "should not reflexively be applied to accidents arising during the course of normal business activities simply because they involve a 'discharge, dispersal, release or escape' of an 'irritant or contaminant'" (quoting *Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72, 78 (Ill. 1997))).

[14] Lex loci delicti (often shortened to lex loci) means "the place of the wrong" and refers to the general rule that in a tort action, a "court applies the substantive laws of . . . 'the state where the last event necessary to make an actor liable for the alleged wrong takes place.'" *Simon v. United States*, 805 N.E.2d 798, 805 (Ind. 2004) (quoting *Hubbard Mfg. Co. v. Greeson*, 515 N.E.2d 1071, 1073 (Ind. 1987)).

Appellants' App. Vol. 4 at 33. The court issued this order after the parties filed their motions for summary judgment on the declaratory judgment claim, so it did not have the benefit of briefing about whether Massachusetts law should also govern the Policy.

[20] Though the parties failed to provide an in-depth analysis of the choice of law issue on appeal,[15] the trial court's lex loci ruling does not control which body of law governs the Policy. Indeed, Indiana's choice of law rules permit a court to "analyze a contract claim and a tort claim independently . . . ." *Simon v. United States*, 805 N.E.2d 798, 801 (Ind. 2004); *see, e.g.*, *Allen v. Great Am. Rsrv. Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002) (analyzing "the choice between South Carolina and Indiana law" separately for "each of the counts of the plaintiffs' complaint"). As this Court has expressed, "although Indiana does not recognize dépeçage,[16] the law of different jurisdictions can apply to different counts and different defendants—just not to issues within each count." *Poultry & Indus. Suppliers, Inc. v. Incubacol, S.A.S.*, 250 N.E.3d 448, 456 n.3 (Ind. Ct. App. 2024), *trans. denied*.

---

[15] Rather than challenging the trial court's decision to apply Massachusetts contract law, the Parsons elected to "analyze the substantive law of the policy under both States' laws." Appellants' Brief at 7. For its part, Crum & Forster asserts "there is no choice-of-law issue in this appeal" because "whether Massachusetts or Indiana law governs is of no consequence, the result is the same . . . ." Appellee's Br. at 36.

[16] "*Dépeçage* is the process of analyzing different issues within the same case separately under the laws of different states." *Simon,* 805 N.E.2d at 801. Jurisdictions that recognize the doctrine of dépeçage "conduct[] separate choice-of-law analyses for different issues within a single theory of recovery, such as liability and damages." *Simon v. United States*, 341 F.3d 193, 195 (3d Cir. 2003), *certified question answered by* 805 N.E.2d 798 (Ind. 2004).

Accordingly, the trial court should have conducted separate choice of law analyses for the declaratory judgment claim and the Parsons' tort claims, especially since the lex loci framework used by the court in its tort analysis is inapplicable to contract claims. Instead, our Supreme Court has articulated a "uniform-contract-interpretation approach" that "applies a single state's law to the entire contract." *Nat'l Union Fire Ins. Co. of Pittsburgh v. Standard Fusee Corp.*, 940 N.E.2d 810, 815 (Ind. 2010), *reh'g denied*. The uniform contract interpretation approach analyzes the factors listed in section 188 of the Restatement (Second) of Conflict of Laws to determine "the state in most intimate contact with the facts." *Id.* The section 188 factors are "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation[,] and place of business of the parties." RESTATEMENT (SECOND) OF CONFLICT OF L. § 188(2) (1971). When these factors are applied to insurance contracts, "[t]he location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law . . . ." RESTATEMENT (SECOND) OF CONFLICT OF L. § 193 cmt. b. As our Supreme Court has summarized,

> in insurance contract cases, we first attempt to determine the principal location of the insured risk. If the principal location of the insured risk can be determined, it is given more weight than other factors. If no such location exists, we continue our analysis of the most intimate contacts. The law of the state in most intimate contact is then to be applied to the entire dispute.

*Standard Fusee Corp.*, 940 N.E.2d at 815-16 (internal citations omitted).

Considering these factors, Indiana, not Massachusetts, is the state in most intimate contact with the Policy. As an initial matter, Zeedyk and his companies were domiciled in Indiana, and their operations were located here. *See id.* at 816 (finding Maryland was the principal location of the insured risk when the insured had one site there and one in Indiana, but its headquarters was in Maryland); *Travelers Indem. Co. v. Summit Corp. of Am.*, 715 N.E.2d 926, 933 (Ind. Ct. App. 1999) (when attempting to find "the principal location of the insured risk[,]" Indiana's courts look for "the state with the largest number of insured sites"). Moreover, on this record the only contact Zeedyk appears to have had with Massachusetts was the single shipment of Ethanol Extraction sent to Parsons. Finally, we note the Policy contains an Indiana-specific endorsement regarding cancellation and nonrenewal, indicating Crum & Forster (who drafted the Policy) expected that Indiana law would govern. *See* Appellants' App. Vol. 2 at 216. For these reasons, we analyze the Policy under Indiana law.

## 2. Interpreting the Policy

The Parsons' main contention on appeal is that Crum & Forster erred in determining that the methanol present in Ethanol Extraction was a "pollutant" under the CGL Total Pollution Exclusion and the TPPL policy part. Furthermore, they claim Crum & Forster's classification of their claims as pollution-related was merely a pretext to "label[] consumer ingestion as

'pollution'" in order "to move the claim[s] into a specialized [TPPL] coverage part designed for environmental contamination, where limits erode for defense costs."[17] Appellants' Reply Brief at 4. Crum & Forster disagrees, arguing that under the "clear and unambiguous language of the" TPPL coverage part, the Ethanol Extraction claims—including the Parsons'—"all . . . arise out of the same or a related 'pollution condition'" and are thus covered by the TPPL part and excluded from CGL coverage.[18] Appellee's Br. at 39-40.

[24] It's well-settled that "[i]nsurance policies are contracts 'subject to the same rules of judicial construction as other contracts.'" *Progressive Se. Ins. Co. v. Chastain*, 153 N.E.3d 330, 337 (Ind. Ct. App. 2020) (quoting *Erie Indem. Co. for Subscribers*

---

[17] One of the Parsons' primary gripes with Crum & Forster's stance that the presence of methanol in Ethanol Extraction was a "pollution condition" is that the TPPL coverage part allows defense costs to eat into the amount of coverage available to third-party claimants, while the CGL part does not.

[18] Crum & Forster also asserts the Parsons are precluded from challenging its coverage determination because Zeedyk and his businesses accepted TPPL coverage. However, Crum & Forster's four-paragraph argument on this point does not contain *any* citation to legal authority, much less authority holding that the insureds' acquiescence to or agreement with Crum & Forster's coverage position is binding against the Parsons. Crum & Forster has therefore waived this argument for our review. *See Ludwig v. Flaherty & Collins, Inc.*, ___ N.E.3d ___, 2026 WL 730709, at *11 (Ind. Ct. App. 2026) (finding a party waived her argument that a jury's "extraordinary" verdict required a new trial because she "failed to cite any legal authority" to support it (citing Ind. Appellate Rule 46(A)(8)(a) (requiring parties to support their arguments with "citation to the authorities [and] statutes . . . relied on . . ."))).

Waiver notwithstanding, this Court has long recognized that "the injured victim of an insured's tort has a legally protectable interest in the insurance policy before he has reduced his tort claim to judgment." *Wilson v. Cont'l Cas. Co.*, 778 N.E.2d 849, 851 (Ind. Ct. App. 2002) (quoting *Cmty. Action of Greater Indianapolis, Inc. v. Ind. Farmers Mut. Ins. Co.*, 708 N.E.2d 882, 885 (Ind. Ct. App. 1999), *trans. denied*), *trans. dismissed*. Because parties injured by an insured's tortious conduct have an interest in the policy independent from the insured's, not even a judicial determination of the insured's rights under the policy is binding against them. *See Am. Fam. Mut. Ins. Co. v. Ginther*, 803 N.E.2d 224, 230 (Ind. Ct. App. 2004) (holding injured third parties were not collaterally estopped by prior declaratory judgment in insurance company's favor because they "were not parties in [that] declaratory action and . . . did not have a full and fair opportunity to litigate the coverage issue"), *reh'g denied, trans. denied*. As such, it's unclear why discussions between an insurance company and its insured—which a third party was not privy to and apparently had no knowledge of—would preclude that party from enforcing its rights under the policy.

at *Erie Ins. Exch. v. Est. of Harris*, 99 N.E.3d 625, 630 (Ind. 2018), *reh'g denied*). Unambiguous terms are given their plain and ordinary meaning, while "courts [generally] construe ambiguous terms against the policy drafter and in favor of the insured." *G&G Oil Co. of Ind., Inc. v. Cont'l W. Ins. Co.*, 165 N.E.3d 82, 87 (Ind. 2021). "However, when a case involves a dispute between a third party and an insurer, as it does here, we determine the general intent of the contract from a neutral stance." *Am. Fam. Ins. Co. v. Globe Am. Cas. Co.*, 774 N.E.2d 932, 936 (Ind. Ct. App. 2002), *trans. denied*.

[25] With these general principles in mind, we begin our analysis of the Policy with the Parsons' contention that their claims were not "excluded from CGL [coverage] pursuant to the Total Pollution Exclusion." Appellants' Br. at 28. We then turn to Crum & Forster's claim that even if CGL coverage would otherwise apply, there is concurrent TPPL coverage that renders the CGL part inapplicable under the Multiple Coverages Limitation.

### 2.1. CGL Coverage

[26] Our Supreme Court has examined pollution exclusions like the Policy's Total Pollution Exclusion four times, and it has found them to be ambiguous each time. *See Am. States Ins. Co. v. Kiger*, 662 N.E.2d 945 (Ind. 1996), *reh'g denied*; *Seymour Mfg. Co. v. Com. Union Ins. Co.*, 665 N.E.2d 891 (Ind. 1996), *reh'g denied*; *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37 (Ind. 2002); *Flexdar*, 964 N.E.2d 845. In *Kiger*, a gas station in Danville was identified as the source of petroleum that contaminated the soil and possibly the city's groundwater supply intermittently from 1990 to 1992. 662 N.E.2d at 946. After spending more than $400,000 to

clean up the contamination, the Indiana Department of Environmental Management (IDEM) filed a complaint against the gas station's owners to recover the cleanup costs. *Id.* at 946-47. The owners then filed a third-party complaint against their general liability insurance carrier seeking a defense and indemnification. *Id.* at 947. The insurance company disclaimed coverage under the policy's pollution exclusion, which provided as follows:

> [T]his insurance does not apply to any of the following:
>
> . . . .
>
> "Bodily injury," "property damage" or loss, cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants."
>
> . . . .
>
> Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

*Id.* at 948. The owners and the insurance company filed cross-motions for summary judgment, and the trial court ruled in favor of coverage. *Id.* at 947.

[27] Our Supreme Court granted an emergency transfer petition to answer "whether the pollution exclusion clause[] . . . , which d[id] not specifically list gasoline as a pollutant, preclude[d] coverage for leakage from underground gasoline

storage tanks." *Id.* at 946. A divided Court held the pollution exclusion did not preclude coverage, reasoning,

> Clearly, this clause cannot be read literally as it would negate virtually all coverage. For example, if a visitor slips on a grease spill then, since grease is a "chemical," there would be no insurance coverage. Accordingly, this clause requires interpretation. . . . . [T]he language excludes coverage for damage caused by "alleged discharge[s]" of "pollutants," which could be understood to mean that a mere allegation of pollution discharge could defeat all coverage.
>
> In any event, since the term "pollutant" does not obviously include gasoline and, accordingly, is ambiguous, we . . . must construe the language against the insurer who drafted it. . . . If a garage policy is intended to exclude coverage for damage caused by the leakage of gasoline, the language of the contract must be explicit.

*Id.* at 948-49 (second alteration in original).

[28] Two months after *Kiger*, the Court addressed a policy with a similar exclusion in *Seymour Manufacturing Company*. There, the United States Environmental Protection Agency sued a Seymour-based manufacturing company to recoup clean-up costs after barrels the company used to store manufacturing waste leaked into the soil and air. *Seymour Mfg. Co.*, 665 N.E.2d at 891-92. The company's general insurance carrier refused to provide a defense, citing, among other provisions, the policy's pollution exclusion. *Id.* at 892. The company sued the insurer alleging it had a duty to defend and moved for summary judgment on that issue, which the trial court denied. *Id.* On interlocutory

appeal, the Supreme Court held that "[i]n light of . . . [*Kiger*], [the company's] motion for summary judgment should have been granted." *Id.*

[29] Four years after deciding *Kiger* and *Seymour Manufacturing Company*, the Court again confronted a similar pollution exclusion in *Freidline*, 774 N.E.2d at 40. There, several employees sued, among others, the owner of the building in which they worked alleging exposure to toxic fumes from glue used to install carpet. *Id.* at 39. The building's general liability carrier disclaimed coverage, citing a pollution exclusion in the policy. *Id.* The building's owners then filed a third-party complaint against the insurance company seeking coverage. *Id.* The trial court granted summary judgment to the insurer, which this Court reversed. *Id.* A unanimous panel reasoned,

> While the policy's definition of pollutants includes the term "fumes," it does not include carpet glue or any other substance used to install carpet. Furthermore, as determined by the *Kiger* court, this clause cannot be read literally as it would negate virtually all coverage. *Kiger*, 662 N.E.2d at 948. Thus, following the *Kiger* decision, since the term "pollutant" does not obviously include carpet glue or substances used to install carpet, the term is ambiguous. *See id.* Consequently, the policy must be construed against the insurer who drafted it to not exclude coverage for the plaintiffs' claims . . . .

*Freidline v. Shelby Ins. Co.*, 739 N.E.2d 178, 184 (Ind. Ct. App. 2000), *reh'g denied, summarily aff'd in relevant part by* 774 N.E.2d 37 (Ind. 2002). On transfer, the Supreme Court "summarily affirm[ed] the Court of Appeals on this point." *Freidline*, 774 N.E.2d at 40.

Finally, in *Flexdar*, an Indianapolis-based manufacturer used a chemical solvent called trichloroethylene (TCE) in the process of making rubber stamps. 964 N.E.2d at 847. After the manufacturer discovered TCE in the soil and groundwater on and around its facility, IDEM informed it that it would be responsible for the costs of cleanup. *Id.* The manufacturer then requested a defense and indemnification from its CGL carrier, prompting the insurance company to seek a declaratory judgment "that coverage for the TCE contamination . . . was excluded pursuant to the pollution exclusion present in the policies." *Id.* Both parties moved for summary judgment, and the trial court ruled in favor of coverage. *Id.* at 848. This Court affirmed, reasoning, "Under *Kiger* and its progeny . . . an insurance policy must be specific if it wishes to except from coverage claims relating to a particular alleged contaminant. It is within the province only of our Supreme Court to decide otherwise." *State Auto Mut. Inc. Co. v. Flexdar, Inc.*, 937 N.E.2d 1203, 1212 (Ind. Ct. App. 2010), *trans. granted*, *opinion vacated by* 964 N.E.2d 845 (Ind. 2012). On transfer, a majority of the Supreme Court rejected this Court's invitation to reconsider its precedents:

> Applying basic contract principles, our decisions have consistently held that the insurer can (and should) specify what falls within its pollution exclusion. . . . Where an insurer's failure to be more specific renders its policy ambiguous, we construe the policy in favor of coverage.

*Flexdar*, 964 N.E.2d at 851.

[31] Here, the Parsons are correct that the Policy's Total Pollution Exclusion falls short of the specificity required by our Supreme Court. Indeed, the exclusion purports to bar CGL coverage for any claim

> which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape, or presence or movement of any "pollutants" at any time and any place, including, without limitation, any indoor or outdoor commercial, industrial, residential or agricultural locale, whether inhabited or uninhabited[.]

Appellants' App. Vol. 2 at 201. In light of our Supreme Court's pollution exclusion precedents, one might expect the Policy to define the term "pollutant" in a way that makes clear which substances fall under the exclusion's sweeping language. But far from it, the Policy's definition of "pollutant" is even broader than the provision at issue in *Kiger*:

> "Pollutants" mean[s] any solid, liquid, gaseous, thermal *or biological* irritant or contaminant, including, *without limitation*, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste *and any matter that by its presence, corrupts, defiles, contaminates or is harmful to the soil, air, or water, living things or the environment*.

*Id.* at 150 (emphasis added to indicate language that did not appear in the *Kiger* exclusion). And though we're reviewing the Policy from a neutral stance, unlike *Kiger* and its progeny, our Supreme Court has repeatedly given clear instruction to insurance companies (who draft policies) to be more specific. Crum & Forster failed to heed that instruction.

Simply put, because the Policy does not unambiguously identify methanol as a "pollutant," Crum & Forster cannot rely on the Total Pollution Exclusion to deny CGL coverage for the Parsons' claims. That is not the end of our analysis, however, because if Crum & Forster is right that there is concurrent coverage under the TPPL part, the Multiple Coverages Limitations would bar CGL coverage. As discussed above, under the Multiple Coverages Limitation,

> If . . . the [TPPL] Coverage Part . . . appl[ies] to an "occurrence", offense, "wrongful act" or "pollution condition" or related "occurrences", offenses, "wrongful acts" or "pollution conditions", then the [CGL] Coverage Part shall not apply to the same or related "occurrences", offenses, "wrongful acts" or "pollution conditions".

*Id.* at 140. We therefore turn to the TPPL part of the Policy to determine whether it applies to the Parsons' claims, which would thus implicate the Multiple Coverages Limitation and render the CGL part inapplicable.

### 2.2. TPPL Coverage

Though our Supreme Court has addressed pollution *exclusions* numerous times, no Indiana appellate court has analyzed how to construe a pollution liability coverage *extension*. Indiana is not alone in that regard, and there is a dearth of precedent from any jurisdiction interpreting the scope of pollution liability coverage provisions. *See Acuity v. Chartis Specialty Ins. Co.*, 861 N.W.2d 533, 546 (Wis. 2015) (citing *URS Corp. v. Zurich Am. Ins. Co.*, 979 N.Y.S.2d 506 (N.Y.Sup. Ct. 2014) as "one of the few cases interpreting a pollution liability policy"). Moreover, most of the cases that have interpreted pollution liability

policies have done so under their jurisdictions' respective versions of the so-called "situational approach," which our Supreme Court has rejected.[19] Nonetheless, many of these cases express a common insight that remains relevant here, which is that the same logic that renders pollution exclusions ambiguous also applies to pollution liability policies. *See London Bridge Resort LLC v. Ill. Union Ins. Co.*, 505 F. Supp. 3d 956, 959 (D. Ariz. 2020) ("Although the public policy concerns for exclusion clauses are slightly different than for coverage policies, the idea that an overly broad definition of pollution could go beyond what is 'reasonably expected by the insured' and create absurd results applies to coverage policies too." (quoting *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 13 P.3d 785, 792 (Ariz. Ct. App. 2000), *reconsideration denied*, *review denied*)); *URS Corp.*, 979 N.Y.S.2d at 510 ("Given the close identity between the traditional pollution exclusion provision and [a] pollution coverage provision, it would be logical to conclude that the two clauses share the same purpose and

---

[19] As summarized by *Flexdar*,

> Courts and commentators identify essentially two main views when it comes to interpreting [pollution] exclusions, namely: a "literal" approach and a "situational" approach. *See Apana v. TIG Ins. Co.,* 574 F.3d 679, 682-83 (9th Cir.2009). . . . Jurisdictions employing a "literal" view of the absolute pollution exclusion generally hold the exclusion to be unambiguous in all circumstances. Where a substance is acting in any manner as an "irritant or contaminant," damage caused thereby is excluded from coverage. . . .

> Jurisdictions applying a more "situational" approach look to factual context and typically uphold the exclusion only in cases of "traditional" environmental contamination. . . . While this framework may be more palatable than the literal view, it can still be problematic because the concept of what is a "traditional" environmental contaminant may vary over time and has no inherent defining characteristics. . . .

> Indiana has gone in a different direction . . . [and] held that the insurer can (and should) specify what falls within its pollution exclusion.

964 N.E.2d at 850-51 (footnote omitted).

are complementary, with one meant to fill the gap in coverage created by the other.").

[34] *URS Corporation*'s analysis is particularly instructive on this point. There, an insurance company issued a contractors pollution liability (CPL) policy that "explicitly noted that it did not provide [CGL] coverage . . . ." *URS Corp.*, 979 N.Y.S.2d at 508. The CPL policy defined "pollution condition" using language similar to the typical CGL pollution exclusion. *Id.* at 507-08. After a fire erupted at a building where the contractor was working, several firefighters and the estates of several others who responded sued to recover damages related to the inhalation of toxic smoke. *Id.* at 508-09. The insured sought a declaratory judgment that the smoke was a pollution condition covered by the CPL policy. *Id.* at 507-08. Noting the lack of case law construing pollution coverage extensions, the court looked to cases "interpreting the pollution *exclusion* in CGL policies." *Id.* at 510. Finding a "close identity between the traditional pollution exclusion provision and" the CPL policy, the court concluded the CPL policy was "meant to fill the gap in coverage created by the" pollution exclusion. *Id.* And since New York's precedents had found CGL pollution exclusions bar coverage only for "broadly dispersed environmental pollution[,]" the court held "an allegation of injury from some sort of poisonous material is not enough to qualify for [pollution] coverage . . . ." *Id.* at 510-11 (quoting *Cont'l Cas. Co.*, 609 N.E.2d at 513).

[35] Though Indiana's treatment of CGL pollution exclusions is quite different from that of New York, we are similarly persuaded that pollution liability policies

should be construed in light of our state's pollution exclusion precedents. Not only is there a close identity between the exclusion and extension at issue here, but the TPPL part of the Policy incorporates the same operative language as the CGL Total Pollution Exclusion. And to read the TPPL part literally, as Crum & Forster asks us to do, would effectively render the CGL policy part a nullity by operation of the Multiple Coverages Limitation, as a literal reading would enable Crum & Forster to classify any claim involving a "chemical" as pollution. Accordingly, to avoid rendering the CGL part a nullity, Crum & Forster could have (and should have) "specif[ied] what falls within its pollution" provisions. *Flexdar*, 964 N.E.2d at 851. Because Crum & Forster did not do so, it cannot rely on the TPPL coverage part to deny CGL coverage for the Parsons' claims.

[36] Moreover, we find wisdom in the observation made by other jurisdictions that it would produce absurd results to "reflexively" characterize claims as pollution "simply because they involve a 'discharge, dispersal, release or escape' of an 'irritant or contaminant.'" *W. Alliance Ins. Co. v. Gill*, 686 N.E.2d 997, 999 (Mass. 1997) (quoting *Am. State Ins. Co. v. Koloms*, 687 N.E.2d 72, 78 (Ill. 1997)); *see also Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 882 P.2d 703, 719 (Wash. 1994) (the use of the terms "discharge, dispersal, release[,] or escape . . . carry the connotation of the issuance of a substance from a state of containment" (quoting *Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.*, 480 N.W.2d 368, 374 (Minn. Ct. App. 1992), *review denied*), *clarified on denial of reconsideration*; *Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 679

N.E.2d 1044, 1048 (N.Y. 1997) (recognizing "damages attributable to the discharge or release of a pollutant into the environment" as "the basic requirement for application of the pollution coverage exclusion"). Here, providing CGL coverage for the Parsons' products liability action naturally flows from the fact that while methanol was present in Ethanol Extraction, it had not escaped a state of containment and was therefore not a pollution condition for purposes of qualifying for pollution liability coverage. Moreover, the fact that the Policy's common terms did not define PCOH coverage as applicable in the TPPL context suggests the TPPL part was not intended to apply to products liability claims like the Parsons'.

[37] In sum, no part of the manufacture or sale of Ethanol Extraction involved the discharge, release, etc. of methanol. Methanol was present in the finished product not because an otherwise pure batch of ethanol was contaminated, but because Zeedyk mislabeled industrial alcohol as safe for human consumption. Even though Zeedyk produced, marketed, and sold a product that *contained* methanol, under these circumstances an ordinary insured would expect the resulting claims to be covered under the CGL part of the Policy. *See Allgood v. Meridian Sec. Ins. Co.*, 836 N.E.2d 243, 246 (Ind. 2005) ("Policy terms are interpreted from the perspective of an ordinary policyholder of average intelligence[.]" (quoting *Burkett v. Am. Fam. Ins. Grp.*, 737 N.E.2d 447, 452 (Ind. Ct. App. 2000)). Accordingly, the TPPL part of the Policy is inapplicable to the Parsons' claims, and the Multiple Coverages Limitation does not displace CGL coverage.

## Conclusion

[38] For these reasons, we conclude that as a matter of law, the Parsons' claims are covered by the CGL part of the Policy, and there is no concurrent coverage under the TPPL part that would trigger application of the Multiple Coverages Limitation. We therefore reverse the trial court's judgment and remand with instructions for it to deny Crum & Forster's motion for summary judgment and grant the Parsons' cross-motion.

[39] Reversed and remanded with instructions.

Brown, J., and Altice, J., concur.

ATTORNEYS FOR APPELLANTS

Robert W. Johnson
Travis N. Jensen
Janet M. Wallace
Michael D. Devor
Johnson Jensen LLP
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

Crystal G. Rowe
Jacob W. Zigenfus
Kightlinger & Gray, LLP
New Albany, Indiana

James J. Hickey
Kennedys Law, LLP
Chicago, Illinois